# United States Court of Appeals
## For the First Circuit

―――――――――

Nos. 12-1289, 12-1290

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN BRAVO FERNANDEZ; HECTOR MARTÍNEZ MALDONADO,

Defendants, Appellants.

―――――――――

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

―――――――――

Before

Howard, Lipez, and Thompson,
Circuit Judges.

―――――――――

Martin G. Weinberg, with whom David Z. Chesnoff, Chesnoff & Schonfeld, Kimberly Homan, Jose A. Pagan, and Pagan Law Offices were on brief, for appellant Bravo Fernandez.
Abbe David Lowell, with whom Christopher D. Man and Chadbourne & Parke LLP were on brief, for appellant Martínez Maldonado.
Peter M. Koski, Deputy Chief, Criminal Division, Public Integrity Section, United States Department of Justice, with whom Lanny A. Breuer, Assistant Attorney General, and Mary Patrice Brown, Deputy Assistant Attorney General, were on brief, for appellee.

June 26, 2013

**LIPEZ, Circuit Judge**. This case presents multiple issues of substantial importance, including a question of first impression in this circuit on the interpretation of the federal program bribery statute, 18 U.S.C. § 666. Defendants are a Puerto Rico legislator and a Commonwealth businessman who were charged, inter alia, with unlawfully exchanging a trip to Las Vegas to attend a prize fight for favorable action on legislation. A jury returned guilty verdicts against both men, Juan Bravo Fernandez ("Bravo") and Hector Martínez Maldonado ("Martínez"), and they now challenge their convictions on numerous grounds. Foremost is their contention that the jury was allowed to convict on a gratuity theory which is beyond the scope of § 666.

Unlike most circuits to have addressed this issue, we conclude that § 666 does not criminalize gratuities. Because the district court's instructions permitted the jury to find guilt on the § 666 counts based on a gratuity theory, Defendants' convictions on that count must be vacated. In addition, we conclude that the Double Jeopardy Clause, though for reasons that differ for each Defendant, entitles both men to acquittal on their respective conspiracy charges.

**I.**

**A. Factual Background**

We briefly summarize the relevant facts, reserving for our analysis a more detailed discussion of the facts relevant to

-3-

each issue presented on appeal.  We view the facts in the light most favorable to the jury's verdicts.  See United States v. Ciresi, 697 F.3d 19, 23 (1st Cir. 2012).

From January 2005 until early 2011, Martínez served in the Senate of the Commonwealth of Puerto Rico.[1]  When Martínez became a senator he was assigned to the Public Safety Committee, where he served as chairman.  Bravo was the president of Ranger American, a private firm that provides security services, including armored car transportation and security guard staffing.

In early 2005, Bravo advocated for the passage of legislation related to the security industry in Puerto Rico.  One of these bills, Senate Project 410, addressed issues pertaining to security at shopping malls, while the other, Senate Project 471, involved licensing requirements for armored car companies.  The government produced testimony at trial that the passage of these bills would have provided substantial financial benefits to Ranger American.  As chairman of the Public Safety Committee, Martínez was in a position to exercise a measure of control over the introduction and progression of the bills through the Committee and the Senate.

---

[1] The record does not specify the duration of Martínez's tenure in the Puerto Rico Senate.  We take judicial notice of the fact that he resigned his seat in early 2011.  See Fed. R. Evid. 201(b) (allowing a court to take judicial notice of a fact "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

On May 14, 2005, prominent Puerto Rican boxer Félix "Tito" Trinidad was scheduled to fight Ronald Lamont "Winky" Wright at the MGM Grand Hotel & Casino in Las Vegas, Nevada. On March 2, Bravo purchased four tickets to the fight at a cost of $1,000 per ticket. The same day, Martínez submitted Senate Project 410 for consideration by the Puerto Rico Senate. On April 20, Martínez presided over a Public Safety Committee hearing on Senate Project 471 at which Bravo testified. The next day, Bravo booked one room at the Mandalay Bay Hotel in Las Vegas. On May 11, Martínez issued a Committee report in support of Senate Project 471.

Bravo arranged for first-class airline tickets to Las Vegas for himself, Martínez, and another senator, Jorge de Castro Font.[2] In Las Vegas, the three men stayed in separate rooms at the Mandalay Bay for two nights. Bravo paid for Martínez's room the first night, and de Castro Font paid for Martínez's room the second night. The men, along with de Castro Font's assistant, went out to dinner the day before the fight, with Bravo footing the $495 bill. The men attended the Tito Trinidad fight the next night, using the $1,000 tickets Bravo had purchased.

---

[2] In 2008, Jorge de Castro Font was indicted on numerous counts relating to corruption by an elected official. See United States v. De Castro-Font, 587 F. Supp. 2d 353, 355 (D.P.R. 2008). On January 29, 2009, de Castro Font pled guilty to 21 counts of the indictment filed against him. He received a sentence of sixty months' imprisonment. See United States v. De Castro-Font, 08-CR-337-01(FAB), Doc. 353 (D.P.R. May 17, 2011).

The day after the fight, Bravo, Martínez, and de Castro Font flew from Las Vegas to Miami, where they spent the night in individual hotel rooms at the Marriott South Beach. The rooms were reserved and paid for by Bravo at a total cost of $954.75. The next day, on May 16, the three returned to Puerto Rico.

On May 17, de Castro Font, acting as Chair of the Committee on Rules and Calendars, scheduled an immediate vote on the floor of the Puerto Rico Senate for Senate Project 471. Both de Castro Font and Martínez voted in support of the bill. The next day, Martínez issued a Committee report in favor of Senate Project 410. On May 23, de Castro Font scheduled an immediate vote on the floor of the Senate for Senate Project 410. Again, both de Castro Font and Martínez voted for the bill.

## B. Procedural Background

On June 22, 2010, a grand jury returned an indictment charging Bravo and Martínez with (1) violating 18 U.S.C. § 371 by conspiring to (a) commit federal program bribery, and (b) travel in interstate commerce in aid of racketeering; (2) violating 18 U.S.C. § 1952(a)(3)(A) by traveling in interstate commerce with the intent to "[p]romote, establish, carry on, and facilitate the promotion, establishment, and carrying on," of unlawful activity, specifically (a) federal program bribery in violation of § 666, and (b) bribery in violation of P.R. Laws Ann., tit. 33, §§ 4360 and 4363; and (3) federal program bribery in violation of § 666. Martínez was

-6-

additionally indicted for obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3).

The case went to trial on February 14, 2011.  On March 7, 2011, a jury convicted Bravo of conspiracy to travel in interstate commerce in aid of racketeering (count one), interstate travel in aid of racketeering with the intent to promote bribery in violation of Puerto Rico law (count two), and federal program bribery (count four).  The jury found Martínez guilty of conspiracy (count one), but checked "No" as to each potential object of the conspiracy.  He was also convicted of federal program bribery (count five).  The jury acquitted Martínez of interstate travel in aid of racketeering (count three) and obstruction of justice (count six).

The trial court granted Bravo's motion for judgment of acquittal on count two, finding that the repeal of the Puerto Rico bribery laws before the trip took place made it impossible for Bravo to satisfy the "thereafter" element[3] of a Travel Act violation.  It initially "dismissed" Martínez's conviction on count one because the jury rejected both potential objects of the conspiracy, but then "reinstated" the conviction the next day, and eventually dismissed it without prejudice.  On March 1, 2012, the district court sentenced both defendants to 48 months of

---

[3] See infra Part V.

imprisonment.  Bravo received a fine of $175,000 and Martínez a fine of $17,500.[4]

## C. Issues on Appeal

Both Defendants challenge their substantive § 666 convictions on numerous grounds.  Martínez challenges on double jeopardy grounds the district court's decision to reinstate his conspiracy conviction and then dismiss it without prejudice.  Bravo also challenges his conspiracy conviction, arguing, among other things, that the judgment of acquittal on the Travel Act count requires the entry of judgment of acquittal on the conspiracy count, as § 666, given the findings by the jury, cannot serve as an object of the conspiracy to violate the Travel Act.

## II.

Defendants raise several challenges to the scope of the federal program bribery statute, 18 U.S.C. § 666, and, identifying certain elements of the statute, they also claim that the circumstances of this case do not satisfy any of those elements. We review the questions of law raised in their arguments de novo,

---

[4] Bravo and Martínez both filed motions for bail pending appeal before the district court, and both motions were denied. Martínez began serving his sentence on March 1, 2012, while Bravo began serving his on May 7, 2012. Bravo began serving his sentence later because of some health issues. Defendants subsequently brought their motions for bail pending appeal before us, and, in early March 2012, both were denied. Following oral argument in November 2013, we received Defendants' renewed motions for bail pending appeal on December 11, 2012. They were granted on January 2, 2013.

<u>United States</u> v. <u>Place</u>, 693 F.3d 219, 227 (1st Cir. 2012); to the extent that their claims challenge the sufficiency of the government's evidence, we again employ de novo review, appraising the proof in the light most favorable to the verdict, <u>United States</u> v. <u>Rodríquez-Vélez</u>, 597 F.3d 32, 38 (1st Cir. 2010).

**A. Agents**

Section 666 requires the government to show that the individual receiving or soliciting the bribe was "an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof."  18 U.S.C. § 666(a)(1).  The term "agent" is defined as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." <u>Id.</u> § 666(d)(1).  Defendant Martínez maintains that he could not be convicted under § 666(a)(1)(B) because he was not an agent of the Commonwealth of Puerto Rico. Defendant Bravo argues that because neither Martínez nor de Castro Font were agents of the Commonwealth, he cannot be guilty of bribing them pursuant to § 666(a)(2).

**1. The Scope of the Agency**

At the outset, we reject any notion that state legislators are categorically exempt from prosecution under § 666. Indeed, the plain language of the statute includes a "representative" of a "government" in the list of positions that

fall under the statute's definition of "agent," 18 U.S.C. § 666(d)(1), and there is no more classic government "representative" than a legislative branch officer. See United States v. Lipscomb, 299 F.3d 303, 333 (5th Cir. 2002) ("Congress clearly sought to apply § 666 to legislative-branch officials."); United States v. Sunia, 643 F. Supp. 2d 51, 67 (D.D.C. 2009) (acknowledging that "a legislator who misuses his legislative authority to facilitate corrupt practices affecting agency programs that receive federal funds may well fall within the ambit of § 666").

Defendants' more nuanced argument is that the government failed to sufficiently specify the entity for which Martínez and de Castro Font were agents. They maintain that Martínez may only be appropriately classified as a representative (and thus an agent) of the Puerto Rico Senate, and not -- as the indictment alleged -- of the Commonwealth as a whole. This distinction is significant, Defendants claim, because the Puerto Rico Senate itself had no connection with, or control over, the federal funds identified by the two government witnesses, and without such a connection the government cannot show that "the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program." 18 U.S.C. § 666(b). If the $10,000 threshold is not met, then the actions of the agents of the non-qualifying organization, government, or agency -- or the

-10-

actions of others with respect to those agents -- cannot implicate § 666.

Once again we need go no further than the plain language of the statute to conclude that Martínez and de Castro Font may be properly considered "agents" of the Commonwealth of Puerto Rico. Among the five types of entities for which one may be an agent within the meaning of § 666 is a state government.[5] See 18 U.S.C. § 666(a)(1), (2) (referring to "an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof"). The Puerto Rico Senate is a constituent part of the Commonwealth government, created by the Puerto Rico Constitution. See P.R. Const. art. III, § 1. Its members are thus part of the limited category of government officials who represent the "State" as a whole, unlike employees of localities or of agencies at every level of government. As such, they easily fall within the concept of "an agent of . . . a State . . . government." Martínez and de Castro Font were thus properly considered agents of the Commonwealth of Puerto Rico under § 666.

At trial, the Associate Director for the Office of Budget and Management testified that during 2005 -- the year of the

---

[5] Under § 666, the definition of "State" includes "a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States." 18 U.S.C. § 666(d)(4) (emphasis added). Because "State" is a term of art in § 666, we shall refer to Martínez and de Castro Font as "State senators."

charged conduct -- the Commonwealth received over $4.7 billion in federal funds.  Because Martínez and de Castro Font are agents of the Commonwealth, the evidence was sufficient to show that they are agents of a "government . . . [that] receives, in any one year period, benefits in excess of $10,000 under a Federal program."  18 U.S.C. § 666(b).

### 2. Agent Control of Expenditures

Defendants argue that being an "agent" under § 666 must include an element beyond merely representing the entity.  Framing their argument partially in constitutional terms, they assert that, to establish the requisite link to Congress's authority to legislate under the Necessary and Proper Clause, an "agent" under § 666 "must be 'authorized to act on behalf of [the entity] with respect to its funds.'"  United States v. Whitfield, 590 F.3d 325, 344 (5th Cir. 2009) (quoting United States v. Phillips, 219 F.3d 404, 411 (5th Cir. 2000)); see also Sabri v. United States, 541 U.S. 600, 605 (2004) (describing Congress's authority under the Necessary and Proper Clause).  Defendants maintain that the government failed to adduce any evidence at trial establishing that either Martínez or de Castro Font, acting as senators, had the authority to control the expenditure of funds by any entity receiving federal funds, and that the senators therefore do not qualify as "agents" for purposes of § 666.

We disagree. Neither the statutory language nor constitutional principles lead to such a restricted understanding of the provision. As the Eleventh Circuit recently noted when presented with this argument, "[n]owhere does the statutory text either mention or imply an additional qualifying requirement that the person be authorized to act specifically with respect to the entity's funds." United States v. Keen, 676 F.3d 981, 989-90 (11th Cir. 2012). The statute merely requires that the individual be "authorized to act on behalf of another person or government." 18 U.S.C. § 666(d)(1). In interpreting the text of a statute, "we will not depart from, or otherwise embellish, the language of a statute absent either undeniable textual ambiguity, or some other extraordinary consideration, such as the prospect of yielding a patently absurd result." Pritzker v. Yari, 42 F.3d 53, 67-68 (1st Cir. 1994) (citations omitted); cf. Salinas v. United States, 522 U.S. 52, 57-58 (1997). Defendants fail to show that any absurd result would follow from a reading loyal to the plain meaning of the statute.

The Supreme Court's and this circuit's § 666 jurisprudence support the conclusion that the statute incorporates no embellishment on the concept of "agent." Indeed, the Supreme Court has repeatedly rejected constructions of § 666 that would impose limits beyond those set out in the plain meaning of the statute. In Salinas, for example, the Court rejected a defendant's

-13-

attempt to read into the statute an extra-textual requirement of proof that "the bribe in some way affected federal funds, for instance by diverting or misappropriating them, before the bribe violates § 666(a)(1)(B)." 522 U.S. at 55-56. In reaching its conclusion, the Court pointed to the "enactment's expansive, unqualified language, both as to the bribes forbidden and the entities covered." Id. at 56. Seven years later, in Sabri v. United States, the Court rejected a similar argument that the statute requires proof of a "nexus" between a bribe or kickback and some federal money. It noted that while "not every bribe or kickback offered or paid to agents of governments covered by § 666(b) will be traceably skimmed from specific federal payments, or show up in the guise of a quid pro quo for some dereliction in spending a federal grant," the absence of such links does not "portend[] . . . enforcement beyond the scope of federal interest, for the reason that corruption does not have to be that limited to affect the federal interest." 541 U.S. at 605-06; see also Fischer v. United States, 529 U.S. 667, 677-79 (2000) (adopting broad reading of "benefits" under § 666(b) in light of statutory language "reveal[ing] Congress' expansive, unambiguous intent to ensure the integrity of organizations participating in federal assistance programs").

We previously addressed the scope of § 666(d)(1)'s definition of "agent" in United States v. Sotomayor-Vázquez, 249

-14-

F.3d 1 (1st Cir. 2001). Drawing largely from the Supreme Court's interpretation of the statute in Salinas, we held that "an expansive definition of 'agent' is necessary to fulfill the purpose of § 666, i.e., to protect the integrity of federal funds." Id. at 8. In support of this reading, we quoted at length from the dissent in United States v. Phillips:

> [T]he expansive statutory definition [in § 666(d)(1)] recognizes that an individual can affect agency funds despite a lack of power to authorize their direct disbursement. Therefore, to broadly protect the integrity of federal funds given to an agency, § 666 applies to any individual who represents the agency in any way, as representing or acting on behalf of an agency can affect its funds even if the action does not directly involve financial disbursement.

Id. at 8 (quoting Phillips, 219 F.3d at 422 n.3 (Garza, J., dissenting)). We thus held that "an outside consultant with significant managerial responsibility" could be an "agent" of a government entity. Id.

In keeping with our own precedent and that of the Supreme Court, we conclude that embracing an approach faithful to the plain language of § 666 is appropriate here. Even if the officials accepting bribes do not have the ability to control the expenditure of an entity's funds, "it cannot be denied that their fraudulent conduct poses a threat to the integrity of the entity, which in turn poses a threat to the federal funds entrusted to that entity." Keen, 676 F.3d at 990; see also United States v. Hines, 541 F.3d

-15-

833, 835-36 (8th Cir. 2008). Such conduct "raise[s] the risk [that] participating organizations will lack the resources requisite to provide the level and quality of care envisioned by the program." Fischer, 529 U.S. at 681-82; cf. Sabri, 541 U.S. at 606 ("Money is fungible, bribed officials are untrustworthy stewards of federal funds, and corrupt contractors do not deliver dollar-for-dollar value."). Narrowing the scope of § 666(d)(1)'s definition of "agent" would be "inconsistent not only with the expansive, unqualified language that Congress has elected to use, but also with Congress' clear objective of ensuring the integrity of entities receiving substantial sums of federal funds." Keen, 676 F.3d at 991 (citation omitted) (internal quotation marks omitted). We therefore decline to do so.

These concerns about financial integrity also doom Defendants' constitutional argument. "[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." United States v. Comstock, 130 S. Ct. 1949, 1956 (2010). In rejecting a different Necessary and Proper Clause challenge to § 666 in Sabri,[6] the Supreme Court wrote:

----

[6] The defendant in Sabri argued that § 666 could not be constitutionally applied "because it fails to require proof of any connection between a bribe or kickback and some federal money."

> Congress has authority under the Spending
> Clause to appropriate federal moneys to
> promote the general welfare, Art. I, § 8, cl.
> 1, and it has corresponding authority under
> the Necessary and Proper Clause . . . to see
> to it that taxpayer dollars appropriated under
> that power are in fact spent for the general
> welfare, and not frittered away in graft or on
> projects undermined when funds are siphoned
> off or corrupt public officers are derelict
> about demanding value for dollars.

541 U.S. at 605.

We have no hesitation in concluding that "measures to police the integrity of entities receiving federal funds fall under the scope of this power," Keen, 676 F.3d at 991, even absent evidence of an agent's authority to act specifically with respect to the covered entity's funds. "Congress does not have to sit by and accept the risk of operations thwarted by local and state improbity." Sabri, 541 U.S. at 605. To accept that there can only be harmful effects of such dishonest conduct when the actor has authority to control the expenditure of the entity's funds would be naive; to accept that the prohibition of such conduct by such individuals is not "rationally related" to Congress' implementation of its constitutionally enumerated powers would be an unduly restrictive application of that standard. The Supreme Court has stated that to fall within the scope of the federal interest, "[i]t is certainly enough that the statutes condition the offense on a threshold amount of federal dollars defining the federal interest,

---

541 U.S. at 604.

-17-

such as that provided [in § 666]." Id. at 606. We see no basis for departing from that view here.

## B. The Transactional Element

For a bribe to fall within the purview of § 666, it must be made "in connection with any business, transaction, or series of transactions of [the covered] organization, government, or agency involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B), (a)(2). This requirement has been referred to as the "transactional element" of § 666. United States v. Robinson, 663 F.3d 265, 270 (7th Cir. 2011). Defendants point out that a circuit split exists as to how the $5,000 threshold in the transactional element is met, but argue that under either approach the government's evidence was insufficient. Taking this opportunity to clarify the correct standard, we conclude that under the proper approach the evidence was sufficient to satisfy the $5,000 threshold and the transactional element generally.

### 1. Value of Bribe or Transaction?

In determining how to calculate the $5,000 requirement, some courts have suggested that a court should look to the value of the bribe actually offered or paid. See United States v. Abbey, 560 F.3d 513, 521 (6th Cir. 2009) (stating that "§ 666 contains . . . a requirement that the illegal gift or bribe be worth over $5,000"); United States v. Spano, 401 F.3d 837, 839 (7th Cir. 2005) ("[T]o establish a case under § 666, the government need only prove

that an agent . . . was offered or accepted a bribe worth $5000 or more . . . ."); United States v. LaHue, 170 F.3d 1026, 1028 (10th Cir. 1999) (stating that § 666 "prohibits the unlawful acceptance of anything of value of $5,000 or more"). Other courts, however, have held that the $5,000 requirement "refers to the value of the 'business, transaction, or series of transactions,' not the value of the bribe." United States v. McNair, 605 F.3d 1152, 1185 n.38 (11th Cir. 2010); see also United States v. Duvall, 846 F.2d 966, 976 (5th Cir. 1988) ("[I]t is clear that the $5000 figure qualifies the transactions or series of transactions that the recipient of the bribe carries out in exchange for receiving 'anything of value.'").

In our view, the statutory language is unambiguous and plainly requires the latter reading. Applied to the present case, § 666(a)(1)(B) prohibits a government agent from accepting or agreeing to accept "anything of value" from another individual "intending to be influenced or rewarded in connection with any business, transaction, or series of transactions" of that government "involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B) (emphasis added). Section 666(a)(2) prohibits offering, giving, or agreeing to give "anything of value" to an individual with the "intent to influence or reward" a government agent "in connection with any business, transaction, or series of transactions" of that government "involving anything of

-19-

value of $5,000 or more." Id. § 666(a)(2) (emphasis added). The thing accepted or agreed to be accepted in § 666(a)(1)(B) -- and the thing given or offered in § 666(a)(2) -- is the bribe. Thus, the bribe can be "anything of value" -- it need not be worth $5,000. The $5,000 element instead refers to the value of the "business" or "transaction" sought to be influenced by the bribe. "In other words, the subject matter of the bribe must be valued at $5,000 or more; the bribe itself need only be 'anything of value.'" Robinson, 663 F.3d at 271.

We note, however, that the value of the bribe may be relevant in determining the value of the bribe's objective. In United States v. Marmolejo, 89 F.3d 1185 (5th Cir. 1996), for example, the court looked to the value of bribes where the subject matter of the bribes consisted of "intangible items." The defendants in Marmolejo were two local law enforcement officers who had agreed to permit conjugal visits between an inmate and his wife (and his girlfriend) in exchange for a monthly payment of $6,000 and $1,000 per conjugal visit. Id. at 1191. The court noted that "[t]he transactions involved something of value -- conjugal visits that [the prisoner] was willing to pay for," id. at 1193 -- and it looked to "traditional valuation methods" to estimate that value, id. at 1194. The court concluded that the prisoner's willingness to pay $6,000 per month plus $1,000 per visit set the market value for the conjugal visits, and it thus found that the transactions

-20-

between the prisoner and the two defendants "involved something of value of $5,000 or more." Id. at 1194 (internal quotation marks omitted).

Hence, where the subject matter of the bribe is a "thing of value" without a fixed price, courts may look to the value of the bribe as evidence of the value of the "business, transaction, or series of transactions." That collateral use does not alter the proposition that the bribe itself need only consist of "anything of value."

### 2. "Business or transaction" requirement

Defendants maintain that the enactment of Senate Projects 410 and 471 should not be considered to be "in connection with any business, transaction, or series of transactions . . . involving anything of value of $5,000 or more" under § 666. They offer several justifications for this position. We find none of them persuasive.

First, Defendants focus on the "in connection with" language. Their attack is anchored in a Fifth Circuit case, United States v. Whitfield, which involved two state judges who were convicted of accepting bribes from an attorney in exchange for favorable rulings in his cases. 590 F.3d at 335. The government argued, and the court assumed, that the judges were "agents" of the Administrative Office of the Courts ("AOC"), a Mississippi state agency that received over $10,000 in federal funds and was "charged

-21-

with assist[ing] in the efficient administration of the <u>nonjudicial</u> business of the courts of the state." <u>Id.</u> at 344 (emphasis added) (citation omitted) (internal quotation marks omitted). The court held, however, that the judges' rulings were not made "in connection with" the business or transactions of the AOC, as they were made while the judges were performing purely <u>judicial</u> duties. <u>Id.</u> at 346-47. Here, Defendants maintain that the federal funds identified by the government went to the Puerto Rico Departments of Education and Treasury, and because there is no nexus between the Departments of Education and Treasury and the act of legislating Senate Projects 410 and 471 in the Puerto Rico Senate, the legislation was not "in connection with" the business or transactions of the federally funded entity.

Whatever the merits of <u>Whitfield</u>'s "nexus" requirement, they are not implicated in this case, as we have determined that Martínez and de Castro Font were agents of the Commonwealth of Puerto Rico, which receives federal funds. When the judges in <u>Whitfield</u> were acting in their capacity as judicial decisionmakers, they were not acting within their scope as agents of the AOC, as the AOC was specifically limited to the nonjudicial business of the courts. By contrast, when Martínez and de Castro Font were acting in their capacity as legislators, they were performing the precise functions that members of a state legislative body perform as agents of a state government. The legislative acts that

-22-

constituted the subject of the bribes had a direct "connection with the business, transaction, or series of transactions" of the Commonwealth of Puerto Rico.

Second, Defendants argue that the passing of Senate legislation cannot be considered "business" or a "transaction" under § 666. The thrust of their argument is that the terms "business" and "transaction" should be construed narrowly to encompass only commercial conduct, and "the Senate does not conduct business or financial transactions through legislating."

In Salinas, the Supreme Court rejected a defendant's similar attempt to impose a narrowing construction on § 666. 522 U.S. at 57. There, the defendant argued that federal funds must be affected to violate § 666(a)(1)(B). Id. at 56. Looking to the language of the statute, the Court concluded that the word "any," which precedes the business or transaction clause, undercuts the attempt to impose the defendant's narrow interpretation. Id. at 56-57. The Court's emphasis on the expansive language in § 666(a)(1)(B) in Salinas suggests that the courts should avoid imposing narrowing constructions on that language. Furthermore, such a reading would foreclose large swaths of government activity that, though technically "non-commercial," could be profitable for unscrupulous individuals to attempt to influence. This narrow construction would be contrary to Congress's intent. See id. at 56 (citing § 666's "expansive, unqualified language, both as to the

bribes forbidden and the entities covered," as evidence of legislative intent to construe statute broadly). Recently confronting this argument, the Seventh Circuit stated:

> The "business" of a federally funded "organization, government, or agency" is not commonly "business" in the commercial sense of the word. An interpretation that narrowly limits the scope of the transactional element to business or transactions that are commercial in nature would have the effect of excluding bribes paid to influence agents of state and local governments. This contradicts the express statutory text.

Robinson, 663 F.3d at 274; see also Marmolejo, 89 F.3d at 1191-92. We agree, and hold that the business or transaction clause in § 666 does not limit the statute's reach to purely commercial conduct.

Third, Defendants focus on the word "involving,"[7] and posit that in order to satisfy § 666, the profit that Ranger American would stand to gain from the passage of the Senate Projects would "have to have been a part of or a necessary consequence of the legislation or have been included in its scope to satisfy the $5,000 requirement." Because the legislation itself was "revenue-neutral" and gave nothing directly to Ranger American, Defendants maintain that neither of the Senate Projects "involved"

---

[7] See 18 U.S.C. § 666(a)(1)(B) (prohibiting an agent from, inter alia, accepting or agreeing to accept anything of value "intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more") (emphasis added).

prospective revenues for Ranger American (and, by extension, Bravo).

We find no support in the case law or the statutory language for this unnecessarily restrictive interpretation of § 666. Even if legislation is revenue-neutral on its face, it is sufficient if the direct and foreseeable effect of that legislation would be to give the individual offering the bribe a particular desired result -- assuming, of course, that the transaction involved something of value of $5,000 or more. Here, the government presented evidence that the foreseeable effect of the passage of Senate Project 471 would be a change in the armored car service industry, which in turn would result in financial benefits to Ranger American and Bravo far exceeding $5,000. This impact is sufficient to satisfy the "involving" requirement of § 666.[8]

### 3. Sufficiency of the Evidence

With the appropriate understanding of the statute in mind, we can easily reject Defendants' sufficiency challenge as to the $5,000 requirement. Miguel Portilla, the president of Capitol

---

[8] For the reasons discussed above, we also reject Defendants' claim that it would somehow violate the Due Process Clause to apply § 666 to state senators who receive bribes in connection with legislation pending before them. Such prosecutions fall squarely within the plain terms of § 666. See United States v. Councilman, 418 F.3d 67, 84-85 (1st Cir. 2005) (rejecting defendant's argument that court engaged in "unforeseeably expansive interpretation" of criminal statute, as acts alleged constitute "'conduct that . . . the statute . . . has fairly disclosed to be within its scope.'" (quoting United States v. Lanier, 520 U.S. 259, 266 (1997))).

Security -- a company with which Ranger American competed -- testified that Senate Project 471, which sought to amend Law 108,[9] would have forced Ranger American's only competitors in the armored car protection business to close down, thereby ensuring that Ranger American would have an effective monopoly on that sector of the security industry in Puerto Rico. Nestor Medina, the former general manager of Loomis Puerto Rico -- a subsidiary of Loomis U.S., an armored car service -- testified that Loomis controlled roughly 35% of the armored car service industry, Ranger American 52%, and Brinks the remainder. Medina stated that Loomis Puerto Rico netted $1.5 million in profits in 2005, and that there would therefore be an extra $1.5 million in additional profits available for other armored car companies to capture if Loomis were to leave the market.[10] Because, according to Portilla's testimony, Ranger American would have been the only company left in that market, it

---

[9] Portilla testified that Law 108 regulates the licensing of security agencies in Puerto Rico.

[10] Defendants take issue with certain of the district court's evidentiary rulings as to Medina's testimony. These arguments do not affect our sufficiency analysis for two reasons. First, Defendants would have suffered no prejudice by this testimony. Portilla's testimony -- which is not challenged by Defendants -- alone provides sufficient evidence on this issue. Any error with respect to the admission of Medina's testimony would therefore be harmless. Second, reviewing the district court's evidentiary rulings under the proper standard, see United States v. Appolon, 695 F.3d 44, 60 (1st Cir. 2012), we cannot say that the district court abused its discretion in permitting Medina to testify on redirect about his views regarding Senate Project 471 and its potential impact on Loomis, nor in its decision denying recross of Medina.

is reasonable to conclude that Bravo's company would stand to capture a substantial portion of that profit. This testimony provided sufficient evidence for a reasonable jury to conclude that Senate Project 471 was worth $5,000 or more to Bravo.

## III.

Defendants challenge the district court's jury instructions as to the § 666 counts on several grounds. We need reach only Defendants' contention that the court's instructions, reinforced by the government's closing argument, permitted the jury to find them guilty of offering and receiving a gratuity, rather than a bribe. This claim necessarily encompasses the argument that § 666 does not in fact criminalize gratuities, a question of first impression in this circuit and an issue that has generated considerable debate in the courts and among commentators.

"We review de novo preserved claims of legal error in jury instructions, but we review for abuse of discretion claimed errors in instructions' form or wording." Uphoff Figueroa v. Alejandro, 597 F.3d 423, 434 (1st Cir. 2010). In our review, "we look to the challenged instructions in relation to the charge as a whole, asking whether the charge in its entirety -- and in the context of the evidence -- presented the relevant issues to the jury fairly and adequately." Drumgold v. Callahan, 707 F.3d 28, 53 (1st Cir. 2013) (quoting Sony BMG Music Entm't v. Tenenbaum, 660 F.3d 487, 503 (1st Cir. 2011)) (internal quotation marks omitted).

Even if we find that a court's instructions were erroneous, we will vacate only if we determine that the error was prejudicial "based on a review of the record as a whole." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 72 (1st Cir. 2009).

We begin by reviewing the instructions. Because we agree that they allowed a gratuities theory of guilt, we then consider the scope of § 666.

## A. The Instructions

### 1. Background

Three of the district court's thirty-six jury instructions are relevant here. The first is Jury Instruction 20, titled "Bribery Concerning Programs Receiving Federal Funds, 18 U.S.C. § 666(a)(2)." This instruction concerns Defendant Bravo. It explains that

> Defendant Bravo is accused of corruptly giving, offering, or agreeing to give things of value to defendant Martínez and/or Jorge de Castro-Font, with intent to influence or reward defendant Martínez and/or de Castro-Font in connection with a business, transaction, or series of transactions of the Commonwealth of Puerto Rico government involving more than $5,000.

Much of the language that follows this introduction tracks the language of the statute and is not problematic. For instance, paragraphs two through four of Jury Instruction 20 state the following:

> For you to find defendant Bravo guilty of bribery, you must be convinced that the

-28-

Government has proven each of the following things beyond a reasonable doubt:

First, that defendant Bravo gave, offered, or agreed to give any thing of value to any person;

Second, that defendant Bravo did so corruptly with the intent to influence or reward an agent of the Puerto Rico government in connection with any business, transaction, or series of transactions of the Puerto Rico government . . . .

This same type of statute-tracking language is found in the second relevant instruction, Jury Instruction 21, titled "Bribery Concerning Programs Receiving Federal Funds, 18 U.S.C. § 666(a)(1)(B)." This instruction concerns the § 666 charges against Defendant Martínez. Paragraphs two through five state:

For you to find defendant Martínez guilty of bribery, you must be convinced that the Government has proven each of the following things beyond a reasonable doubt:

First, that defendant Martínez was an agent of the Commonwealth of Puerto Rico government whose duties included those of an elected Senator of the Commonwealth of Puerto Rico, as charged;

Second, that defendant Martínez solicited, demanded, accepted or agreed to accept any thing of value from another person;

Third, that defendant Martínez did so corruptly with the intent to be influenced or rewarded in connection with some business, transaction or series of transactions of the Puerto Rico government . . . .

However, certain parts of these two instructions include language that does not track the statute. Among these are paragraph ten of Jury Instruction 20 and paragraph eleven of Jury Instruction 21. Paragraph ten states:

-29-

When considering the First and Second elements above, I instruct you that a defendant is not required to have given, offered, or agreed to give a thing of value before the business, transaction, or series of transactions. Rather, the Government may prove that defendant Bravo gave, offered, or agreed to give the thing of value before, after, or at the same time as the business, transaction, or series of transactions. Therefore, the government does not need to prove that defendant Bravo gave, offered, or agreed to offer the trip to Las Vegas before defendant Martínez performed any official action or series of acts.

(Emphases added.) Paragraph eleven of Jury Instruction 21 appears to have a purpose similar to that of paragraph ten of Jury Instruction 20, though paragraph eleven is concerned with the timing of Defendant Martínez's solicitation, demand, acceptance, or agreement to accept the thing of value:

When considering the Second and Third elements above, I instruct you that a defendant is not required to have accepted or received a thing of value before the business, transaction, or series of transactions. Rather, the Government may prove that defendant Martínez solicited, demanded, accepted, or agreed to accept the thing of value before, after, or at the same time as the business, transaction, or series of transactions. Therefore, the Government does not need to prove that defendant Martínez solicited, demanded, accepted or agreed to accept the trip to Las Vegas before defendant Martínez performed any official act or series of acts.

(Emphases added.)

The final relevant instruction is Jury Instruction 22, titled simply "Bribery." This instruction states in full:

-30-

I have used the word "bribery" in these instructions. Bribery requires that the government prove beyond a reasonable doubt the existence of a quid pro quo or, in plain English, an agreement that the thing of value that is given to the public official is in exchange for that public official promising to perform official acts for the giver. It is not sufficient that the thing of value is made to curry favor because of the official's position or that there is some connection in time or place with an official act that is promised to the giver; rather there must be an agreement that the thing of value was offered by defendant Bravo and accepted by Senator Martínez in exchange for a promise to perform an official act.

Defendants maintain that the district court's directions in Jury Instructions 20 and 21 allowed the jury to convict Martínez and Bravo of a gratuity offense. They argue that a permissible construction of Jury Instruction 20 could read as follows:

[T]he Government may prove that defendant Bravo . . . offered . . . the thing of value . . . after . . . the business, transaction, or series of transactions. Therefore, the government does not need to prove that defendant Bravo . . . offered . . . the trip to Las Vegas before defendant Martínez performed any official action or series of acts.

Similarly, Jury Instruction 21 could be read to state:

[T]he Government may prove that defendant Martínez . . . agreed to accept the thing of value . . . after . . . the business, transaction, or series of transactions. Therefore, the Government does not need to prove that defendant Martínez . . . agreed to accept the trip to Las Vegas before defendant Martínez performed any official act or series of acts.

Defendants argue that if Bravo had not offered Martínez anything before Martínez performed an official act, and Martínez had therefore not accepted (or even agreed to accept) anything from Bravo before performing that act, any subsequent offer of a thing of value from Bravo to Martínez cannot be construed as a bribe. Instead, the offer would merely be an offer of a reward for an act taken by Martínez in the past. This, Defendants maintain, is an offer of a gratuity, not a bribe.

The government does not explicitly address this potentially problematic construction of paragraph ten of Jury Instruction 20 and paragraph eleven of Jury Instruction 21. It argues that the titles of those instructions -- "Bribery Concerning Programs Receiving Federal Funds, 18 U.S.C. § 666(a)(2)" and "Bribery Concerning Programs Receiving Federal Funds, 18 U.S.C. § 666(a)(1)(B)" -- make clear that the jury must find bribery, not a mere gratuity. Additionally, the government points to the unambiguous quid pro quo language of Jury Instruction 22, which, it claims, leaves no doubt that the jury was required to find bribery to convict Defendants of violating § 666.

Relatedly, Defendants maintain that the effect of the alleged errors in Jury Instructions 20 and 21 was magnified by certain statements made by the government during its closing argument. Defendants point to the government's statement to the jury that

> it doesn't matter when it was offered or when it was accepted . . . . These instructions clarify that -- that it doesn't matter if the trip was offered before official acts were taken, at the same time official acts were taken, <u>or after official acts were taken</u>, because the crime is offering or accepting the trip with intent to influence or reward.

(Emphasis added.)  This language, Defendants posit, suggests that the government need only prove a "connection" between the official acts and the offer of the Las Vegas trip, rather than a causal relationship.  Defendants argue that the government essentially told the jurors that they could convict Martínez and Bravo of violating § 666 if they found that a mere gratuity -- as opposed to a bribe -- was offered by Bravo and accepted by Martínez.

## 2. Analysis

The Supreme Court explained the distinction between bribes and illegal gratuities in <u>United States</u> v. <u>Sun-Diamond Growers of California</u>, 526 U.S. 398 (1999):

> The distinguishing feature of each crime is its intent element.  Bribery requires intent "to influence" an official act or "to be influenced" in an official act, while illegal gratuity requires only that the gratuity be given or accepted "for or because of" an official act. In other words, for bribery there must be a <u>quid</u> <u>pro</u> <u>quo</u> -- a specific intent to give or receive something of value <u>in exchange</u> for an official act.  An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), <u>or for a past act that he has already taken</u>.

-33-

Id. at 404-05 (third emphasis added) (construing the general federal bribery and gratuity statute, 18 U.S.C. § 201); see also United States v. Mariano, 983 F.2d 1150, 1159 (1st Cir. 1993) (noting in a § 666 case that "[t]he essential difference between a bribe and an illegal gratuity is the intention of the bribe-giver to effect a quid pro quo"). As the Eighth Circuit has noted, "[t]he core difference between a bribe and a gratuity is not the time the illegal payment is made, but the quid pro quo, or the agreement to exchange [a thing of value] for official action." United States v. Griffin, 154 F.3d 762, 764 (8th Cir. 1998). Although the timing of the payment may not provide a conclusive answer as to whether that payment is a bribe or a gratuity, the timing of the agreement to make or receive a payment may: one cannot agree to perform an act in exchange for payment when that act has already been performed. Therefore, if the agreement to exchange a thing of value for an act is made after that act has been performed, that agreement cannot be properly viewed as an agreement to offer or accept a bribe.

With this distinction in mind, it is clear that paragraph ten of Jury Instruction 20 and paragraph eleven of Jury Instruction 21 told the jury that Bravo could be convicted under § 666 for agreeing to give Martínez a gratuity, and that Martínez could be convicted under § 666 for agreeing to accept the same. Paragraph ten explains that for a conviction under § 666, the government need

not prove that Bravo offered or agreed to give Martínez anything of value before the transaction that was the subject of the "payment" took place, and that it is sufficient for conviction to show that Bravo "offered, or agreed to give the thing of value . . . <u>after</u> . . . the . . . transaction." Similarly, paragraph eleven suggests that the government need not prove that Martínez accepted or agreed to accept the thing of value before he performed the act that was the subject of the "payment," and that it is sufficient to show that Martínez "agreed to accept the thing of value . . . <u>after</u> . . . the transaction."

This view of the requirements of § 666 was reinforced by the government's closing argument. Like the court's jury instructions, significant portions of the government's closing argument were consistent with a bribery theory under § 666. However, in emphasizing that "it doesn't matter if the trip was offered . . . after official acts were taken," the government invited the jury to find guilt based on a gratuity theory of liability.

While the language in Jury Instruction 22 correctly states the requirements for a bribery conviction, it was not sufficient to offset the flatly contrary language in Jury Instructions 20 and 21. This is particularly so because the gratuities theory was offered in the instructions on the § 666 counts themselves, whereas the correct bribery language was in a

subsequent global instruction that applied to both the Puerto Rico and federal bribery counts.

Importantly, the evidence presented at trial could support a finding that the "payment" Bravo gave and Martínez received constituted a gratuity. The evidence showed that Martínez supported the Senate Projects <u>after</u> the Las Vegas trip -- he voted in support of both bills within a week of returning -- which is consistent with a quid pro quo, and therefore with a bribery theory. However, he <u>first</u> took actions in support of Senate Projects 410 and 471 -- such as submitting the bills to the Senate -- weeks or months <u>before</u> the trip to Las Vegas, which is consistent with a gratuity theory. Hence, the jury reasonably could have found that the trip was a reward for that prior conduct, rather than the quid pro quo for Martínez's later support of the bills.

Although the instructions allowed the jury to convict Bravo and Martínez of violating § 666 by giving or accepting gratuities, there remains the more difficult question of whether this instruction was legally erroneous. We have never decided whether § 666 criminalizes gratuities in addition to bribes, as the issue has never been squarely before us. We now turn to that question.

## B. Section 666

### 1. Statutory Context

We ordinarily begin with the plain language of a statute in assessing its meaning.  See <u>United States</u> v. <u>Lachman</u>, 387 F.3d 42, 50 (1st Cir. 2004).  Here, however, much of the relevant language originates in another provision, 18 U.S.C. § 201, and it is therefore useful to take a step back and place § 666 into statutory context before looking at its specific language.

Section 666 "was born as the stepchild of another statute, 18 U.S.C. § 201."  Justin Weitz, Note, <u>The Devil is in the Details: 18 U.S.C. § 666 after Skilling v. United States</u>, 14 N.Y.U. J. Legis. & Pub. Pol'y 805, 816 (2011).  Section 201 criminalizes bribes and gratuities on the part of federal officials.  The statute separates the crimes of illegal bribes and illegal gratuities into two sections: § 201(b) outlaws the offering of bribes to public officials, as well as the acceptance of bribes by those officials, while § 201(c) outlaws the offering and acceptance of illegal gratuities.  18 U.S.C. § 201(b), (c).

The scope of § 201 is limited to those "acting for or on behalf of the United States."  As the Senate Report for § 666 noted:

> With respect to bribery, 18 U.S.C. 201 generally punishes corrupt payments to federal public officials, but there is some doubt as to whether or under what circumstances persons not employed by the federal government may be considered as a "public official" under the

> definition in 18 U.S.C. 201(a) as anyone "acting for or on behalf of the United States, or any department, agency or branch of government thereof, including the District of Columbia, in any official function." The courts of appeals have divided on the question whether a person employed by a private organization receiving Federal monies pursuant to a program is a "public official" for purposes of section 201.

S. Rep. No. 98-225, at 369 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3510. Spurred by the Supreme Court's pending consideration of the meaning of § 201 in Dixson v. United States, 465 U.S. 482 (1984), which sought to resolve whether § 201 applied to state and local officials, Congress created § 666 as part of the Comprehensive Crime Control Act of 1984 ("CCCA"), Pub. L. No. 98-473, 98 Stat. 1837 (1984). According to the Senate Report, the purpose of § 666 was to "augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies which are disbursed to private organizations or State and local governments pursuant to a Federal program."[11] S. Rep. No. 98-225 at 369; 1984 U.S.C.C.A.N. at 3510. Significantly, the Senate Report stated that § 666 was to be interpreted "consistent with the purpose of this section to protect the integrity of the vast sums of money distributed through Federal

---

[11] Section 666 has a separate provision that covers theft and fraud. See 18 U.S.C. § 666(a)(1)(A). That provision is not implicated in this case.

programs from theft, fraud, and undue influence by <u>bribery</u>."  S.
Rep. No. 98-225 at 370; 1984 U.S.C.C.A.N. at 3511 (emphasis added).

As originally enacted as part of the CCCA, the 1984
version of § 666 differed somewhat from the current law.  For
instance, what is now § 666(a)(2) was originally § 666(c), which
read in relevant part:

> (c) Whoever offers, gives or agrees to give an
> agent of an organization or of a State or
> local government agency . . . anything of
> value <u>for or because of</u> the recipient's
> conduct in any transaction or matter or any
> series of transactions or matters involving
> $5,000 or more concerning the affairs of such
> organization or State or local government
> agency, shall be imprisoned not more than ten
> years or fined not more than $100,000 . . . .

18 U.S.C. § 666(c) (1984) (emphasis added).  Section 666 was
amended in 1986 as part of the Criminal Law and Procedure Technical
Amendments Act of 1986 ("CLPTA"), Pub. L. No. 99-646, 100 Stat.
3592 (1986).  The House Report noted that "the enactment of the
CCCA came during the final weeks of the 98th Congress, and, due to
demanding time constraints, the CCCA contained a number of
ambiguities and technical defects."  H.R. Rep. No. 99-797, at 16
(1986), <u>reprinted in</u> 1986 U.S.C.C.A.N. 6138.  The purpose of the
CLPTA was "to eliminate these technical defects and to make minor
substantive revisions."  <u>Id.</u>  With respect to § 666 specifically,
the House Report clarified that section 42 of the CLPTA amended the
statute "to avoid its possible application to acceptable commercial
and business practices."  <u>Id.</u> at 30.  The Report explained further:

> 18 U.S.C. 666 prohibits <u>bribery</u> of certain public officials, but does not seek to constrain lawful commercial business transactions. Thus, 18 U.S.C. 666 prohibits corruptly giving or receiving anything of value for the purpose of influencing or being influenced in connection with any business, transaction, or series of transactions. The provision parallels the bank bribery provision (18 U.S.C. 215).

<u>Id.</u> at 30 n.9 (emphasis added).

Two changes to § 666 effected by the CLPTA are noteworthy. First, the "for or because of" language was replaced with "intending to be influenced or rewarded" in § 666(a)(1)(B) (the provision applicable to agents) and "with intent to influence or reward" in § 666(a)(2) (the provision applicable to the individual offering the agent something of value). This change is especially notable, as the pre-amendment language was similar to that found in 18 U.S.C. § 201(c) -- § 201's <u>gratuity</u> provision. Section 201(c)(1)(A) prohibits one from "giv[ing], offer[ing], or promis[ing] anything of value to any public official . . . <u>for or because of</u> any official act performed or to be performed by such public official," 18 U.S.C. § 201(c)(1)(A), and the complementary subsection prohibits public officials from "demand[ing], seek[ing], receiv[ing], accept[ing], or agree[ing] to receive or accept anything of value . . . <u>for or because of</u> any official act," <u>id.</u> § 201(c)(1)(B). Section 666's post-amendments language is much closer to that found in 18 U.S.C. § 201(b) -- § 201's <u>bribery</u> provision. It imposes punishment on one who gives or offers

-40-

anything of value to a public official "with intent . . . to influence" an official act, id. § 201(b)(1)(A), and on a public official who agrees to accept a thing of value "in return for . . . being influenced in the performance of any official act," id. § 201(b)(2)(A).   As the Supreme Court noted in Sun-Diamond, § 201(b)'s intent language implies that "for bribery there must be a quid pro quo -- a specific intent to give or receive something of value in exchange for an official act."  526 U.S. at 404-05.

The second relevant alteration is the addition of the word "corruptly" to the beginning of § 666(a)(1)(B) and (a)(2). Congress neither explained the reason for this change nor defined the term.  However, this is another instance where the language of § 666 was amended in a way that brought the statute closer to § 201's bribery provision.  Section 201(b)(1) punishes one who "corruptly gives, offers or promises anything of value to any public official," id. § 201(b)(1) (emphasis added), and punishes a public official who "corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value," id. § 201(b)(2) (emphasis added).   The word "corruptly" does not appear in § 201(c), the gratuities provision.

With this background in mind, we now analyze the text and structure of the statute.

## 2. The Meaning of § 666

The text of § 666 has remained largely unchanged since the 1986 amendments. Today, the statute reads in relevant part:

> (a) Whoever . . . --
>
>> (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof--
>
> . . . .
>
>>> (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more; or
>
>> (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;
>
>> shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666(a). One of the most conspicuous differences between the texts of § 666 and § 201 concerns the intent element: while § 666 prohibits one from corruptly offering a thing of value with intent to "influence _or reward_" an agent, and prohibits an agent from corruptly soliciting or demanding a thing of value with intent to be "influenced _or rewarded_," the bribery provision applicable to federal officials, § 201(b), does not include the

-42-

alternative "reward": it prohibits one from corruptly offering a thing of value with intent to "influence" an act, and prohibits an official from corruptly soliciting a thing of value with an intent to be "influenced." The word "reward" in § 666 is open to (at least) two different interpretations.[12]

Under the first interpretation, when a payor intends to influence an official's future actions, the payment constitutes a bribe; when a payor intends to reward the official's past conduct (or future conduct the official is already committed to taking), the payment constitutes a gratuity. United States v. Anderson, 517 F.3d 953, 961 (7th Cir. 2008). Several circuits have adopted this reading of the language. Id.; United States v. Ganim, 510 F.3d 134, 150 (2d Cir. 2007) ("[A] payment made to 'influence' connotes bribery, whereas a payment made to 'reward' connotes an illegal gratuity."); United States v. Zimmerman, 509 F.3d 920, 927 (8th Cir. 2007) (citing § 666(a)(1)(B)'s "influenced or rewarded" language in support of finding that "Section 666(a)(1)(B) prohibits both the acceptance of bribes and the acceptance of gratuities intended to be a bonus for taking official action"); United States v. Agostino, 132 F.3d 1183, 1195 (7th Cir. 1997).

Under the second interpretation, the word "reward" does not create a separate gratuity offense in § 666, but rather serves

---

[12] Unfortunately, the legislative history contains no clues about why this word was added in the 1986 amendments.

a more modest purpose: it merely clarifies "that a bribe can be promised before, but paid after, the official's action on the payor's behalf." <u>United States</u> v. <u>Jennings</u>, 160 F.3d 1006, 1015 n.3 (4th Cir. 1998). "This definition accords with the traditional meaning of the term 'reward' as something offered to induce another to act favorably on one's behalf (for example, a bounty offered for the capture of a fugitive)." <u>Id.</u> Under this reading, the terms "influence" and "reward" each retain independent meaning. "Influence" would be used in situations in which, for instance, a payment was made to a local government commissioner in order to induce him to vote in a certain way on a particular matter. "Reward" would be used if a <u>promise</u> of payment was made, contingent upon that commissioner's vote; once the commissioner voted in the way the payor requested, a "reward" would follow. Both of these situations involve a quid pro quo, and both therefore constitute bribes. What matters, of course, is that the <u>offer</u> of payment precedes the official act.

Moreover, a reading consistent with the second interpretation would help to explain the presence of the "corruptly" language in § 666(a)(1)(B) and (a)(2). As discussed <u>supra</u>, § 201 uses the word corruptly <u>only</u> in its bribery provision, § 201(b), not in the gratuity provision, § 201(c). The Fourth Circuit puzzled over this issue in <u>United States</u> v. <u>Jennings</u>, "namely, why § 666(a)(2)'s language prohibiting 'rewards' given

'corruptly' should be interpreted to cover gratuities, when under § 201 <u>any</u> payment made 'corruptly' is a bribe, not an illegal gratuity." <u>Id.</u> (emphasis added). If the inclusion of the word "reward" in § 666 does no more than clarify that the <u>payment</u> of a bribe can occur after the act that is the subject of the bribe is completed (so long as the <u>agreement</u> to pay the bribe for the act or acts is made before the act or acts takes place), the statute still applies only to bribery, and the use of the word "corruptly" in § 666 would comport with the use of the same word in § 201(b): any payment made "corruptly" is a bribe.[13] <u>Cf. Anderson</u>, 517 F.3d at

_____

[13] The Second Circuit took a different view of "corruptly," in keeping with its prior conclusion that § 666 covers gratuities. In <u>United States</u> v. <u>Bahel</u>, the Second Circuit rejected the defendant's argument that the jury charge should have specified that the government needed to prove that he "'had been "corrupted" <u>at the time he acted</u> in his official business.'" 662 F.3d 610, 638 (2d Cir. 2011) (emphasis added). Instead, the court concluded that "in the case of a gratuity, the corrupt intent required under Section 666 refers to an individual's state of mind <u>at the time the payment is received</u>." <u>Id.</u> (emphasis added). This interpretation of "corruptly" is at odds with that of the Fourth Circuit in <u>Jennings</u>, which would appear to require the corrupt intent at the time the agent engages in the act that is the subject of the reward. While <u>Bahel</u>'s definition of "corruptly" supports the Second Circuit's interpretation of § 666 as criminalizing gratuities as well as bribes, the question raised in <u>Jennings</u> remains: if "corruptly" in fact means nothing more than a lack of an innocent motive at the time one receives payment, why does § 201 -- the statute upon which § 666 is based -- fail to include that language in its gratuity provision when it is included in § 201's bribery provision? In other words, although the Second Circuit provides an avenue by which the word "corruptly" could be given independent meaning without cabining § 666 to bribery, that interpretation would seem to vitiate the independent meaning of the same word in § 201 -- again, an important consideration given that § 666 was based on § 201.

-45-

961 ("Unlike a gratuity, a bribe is a payment made with 'a corrupt purpose, such as inducing a public official to participate in a fraud or to influence his official action.'" (quoting U.S.S.G. § 2C1.1 cmt. background)).

Another critical difference between § 666 and § 201 is the maximum penalty authorized under the statutes. One who violates § 201(b), the bribery provision, may be fined, "or imprisoned for not more than fifteen years, or both." 18 U.S.C. § 201(b) (emphasis added). For a violation -- any violation -- of § 666, the statute provides a punishment of a fine, a term of imprisonment of "not more than 10 years," or both. Id. § 666(a) (emphasis added). An even more striking difference in penalties, however, exists between § 666 and § 201's gratuity subsection, the latter of which calls for a term of imprisonment of "not more than two years," id. § 201(c) (emphasis added) -- meaning that § 666 authorizes a term of imprisonment five times longer than that allowed by § 201's gratuities provision.

This dramatic discrepancy in maximum penalties between § 666 and § 201(c) makes it difficult to accept that the statutes target the same type of crime -- illegal gratuities. The difference in sentences contemplated by § 201(b) and § 666 is both less dramatic and more understandable: § 201(b) targets (primarily) federal officials, while § 666 targets non-federal officials who happen to have a connection to federal funds. It is reasonable to

assume that the federal government viewed corrupt federal officials involved in the receipt of bribes as more culpable.[14]

The distinct penalties for bribes and gratuities contained in § 201 highlights an obvious yet important structural difference between §§ 666 and 201: § 666 does not have separate bribery and gratuity subsections.  For those circuits that have found that § 666 criminalizes gratuities, two subsections of § 666 do the same work as four subsections of § 201.  We think it unlikely that Congress would condense two distinct offenses into the same subsection in § 666 when the statute upon which it is based has separate subsections for each offense.  See George D. Brown, Stealth Statute -- Corruption, the Spending Power, and the Rise of 18 U.S.C. § 666, 73 Notre Dame L. Rev. 247, 310 (1998) ("Congress did not . . . enact a mirror image of § 201 for nonfederal officials.  Section 201 contains separate subsections to deal with bribery and gratuities.  Section 666 does not.  It is a mistake to attempt to read the two statutes as equal in reach.").  Furthermore, if Congress did choose to condense bribes and gratuities into a single provision in § 666, it would be odd to do so by merely plugging slightly modified language from § 201(b), its bribery provision, into the statute.  Surely the word "gratuity" --

---

[14] The legislative history of § 666 sheds no light on the reason for these differences in penalties.

which is, of course, mentioned nowhere in the text or legislative history of § 666 -- was not foreign to Congress in 1986.

Although § 666 was enacted to supplement § 201, we can easily hypothesize at least two reasons why Congress may have chosen to supplement only § 201's prohibition of bribery. First, bribes are simply worse than illegal gratuities. See Sun-Diamond, 526 U.S. at 405 (noting the difference in the maximum sentences allowed under § 201(b) and (c) and stating that "[t]he punishments prescribed for the two offenses reflect their relative seriousness"); Charles N. Whitaker, Note, Federal Prosecution of State and Local Bribery: Inappropriate Tools and the Need for a Structured Approach, 78 Va. L. Rev. 1617, 1622 (1992) ("The typical one- to two-year penalty under gratuities statutes evidences the lesser degree of culpability in accepting a gratuity as opposed to a bribe."). Under this theory, Congress may have viewed bribery as far more of a threat to the proper functioning of federally funded programs than gratuities. Because the application of § 666 to gratuities offenses would "take[] the statute deeply into a range of government ethics issues that may be better handled at the state level," Congress may have intended to cabin § 666 "to the hard-core area of bribery[,] where any federal interest in government integrity will be stronger." Brown, supra, at 310 (footnote omitted).

A second (and related) reason why Congress may have limited § 666 to bribery is to avoid what has been characterized as federal overcriminalization. See generally Weitz, supra, at 840; Alex Kozinski & Misha Tseytlin, You're (Probably) a Federal Criminal, in In the Name of Justice 43-56 (Timothy Lynch ed., 2009); Sanford H. Kadish, Comment: The Folly of Overfederalization, 46 Hastings L.J. 1247, 1249-50 (1995). In other words, Congress may have been wary of venturing too far into the thickets of state and local corruption, which often implicate the political processes of the state. See Brown, supra, at 310.

In Sun-Diamond, a case addressing the scope of § 201's gratuity provision, the Supreme Court noted that,

> when Congress has wanted to adopt . . . a broadly prophylactic criminal prohibition upon gift giving, it has done so in a more precise and more administrable fashion.
>
> . . .
>
> [Because] this is an area where precisely targeted prohibitions are commonplace, and where more general prohibitions have been qualified by numerous exceptions . . . a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter.

526 U.S. at 408, 412. Here, too, we feel obligated to choose the scalpel. Other than the ambiguous use of the word "rewarded," the text of § 666, as well as its legislative history and purpose, do not support the argument that Congress intended the statute to

reach gratuities.  The statute was amended in a way that brought its language closer to § 201's bribery provision, and further from § 201's gratuity provision, suggesting the true targets of § 666 are bribes, not gratuities.  Critically, accepting that § 666 criminalizes gratuities would expose defendants convicted of gratuities violations under § 666 to penalties far greater than those faced by individuals convicted of gratuities violations under § 201 -- a strange outcome that we doubt Congress intended.  We therefore hold that gratuities are not criminalized under § 666.[15]

---

[15] We have two responses to the thoughtful concurrence of our colleague that the statute is unclear enough that the rule of lenity precludes Defendants' convictions to the extent that they could have rested on a gratuity.  First, the rule of lenity is rarely applied, and should be reserved for situations in which, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." Barber v. Thomas, 130 S. Ct. 2499, 2509-10 (2010) (citations omitted) (internal quotation marks omitted); see also Muscarello v. United States, 524 U.S. 125, 138-39 (1998) ("The simple existence of some statutory ambiguity . . . is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree."); United States v. Jimenez, 507 F.3d 13, 21 (1st Cir. 2007) ("[G]enuine ambiguity requires more than a possible alternative construction."); accord United States v. Flemming, 617 F.3d 252, 272 (3d Cir. 2010) (noting that "[a]pplication of the rule of lenity is called for only in rare cases").  We have construed § 666 using traditional tools of construction and find no grievous ambiguity or uncertainty.  Lenity is therefore inapplicable. See Councilman, 418 F.3d at 83.

Second, we acknowledge, as our colleague notes, that the Federal Sentencing Guidelines Manual applies separate guidelines for bribes and gratuities under § 201, and it states that both of these guidelines are applicable to § 666.  U.S. Sentencing Guidelines Manual app. A (2011).  Some have suggested that this determination on the part of the Sentencing Commission "weighs in favor of a conclusion that § 666 encompasses bribes and gratuities."  See, e.g., Mark S. Gaioni, Note, Federal

-50-

## C. Conclusion

Given this holding, the language in paragraph ten of Jury Instruction 20 and paragraph eleven of Jury Instruction 21 had no place in the § 666 instructions. By including that language, the court improperly invited the jury to convict both Martínez and Bravo for conduct involving gratuities rather than bribes. Consequently, the jury was allowed to convict Martínez and Bravo on a legally erroneous theory. Although other parts of the jury instructions accurately stated the requirements for a bribery conviction, the fact remains that the jury was confronted with the flatly contrary instructions in paragraph ten of Jury Instruction

---

Anticorruption Law in the State and Local Context: Defining the Scope of 18 U.S.C. § 666, 46 Colum. J. L. & Soc. Probs. 207, 239-41 (2012). We disagree. The Sentencing Commission is in the business of "establish[ing] sentencing policies and practices for the Federal criminal justice system" and "develop[ing] means of measuring the degree to which the sentencing, penal, and correctional practices are effective," 28 U.S.C. § 991(b); it is not in the business of determining what type of conduct a statute does and does not criminalize. See, e.g., United States v. Morales, 590 F.3d 1049, 1052 (9th Cir. 2010) ("Of course, the Commission can't tell federal courts how to interpret statutes."). The Commission's choice to apply the gratuities guideline to § 666 therefore carries no weight in our analysis. Cf. DePierre v. United States, 131 S. Ct. 2225, 2236 (2011) ("We have never held that, when interpreting a criminal statute, deference is warranted to the Sentencing Commission's definition of the same term in the Guidelines."); United States v. Gowing, 683 F.3d 406, 410 (2d Cir. 2012) ("The Sentencing Commission, which promulgates the Guidelines, is entitled to no deference when it interprets criminal statutes."); United States v. Palacio, 4 F.3d 150, 155 (2d Cir. 1993) ("[U]nless the Sentencing Commission is construing its own authority as an agency, its view of the substantive meaning of a criminal statute is unlikely to be entitled to any deference." (internal citations omitted)).

20 and paragraph eleven of Jury Instruction 21.  As noted, the government's closing argument improperly invited the jury to convict the Defendants on the proscribed "gratuity theory," and the evidence presented at trial could support a finding that the "payment" Bravo gave and Martínez received constituted a gratuity. See supra Part III(A)(2).  Under these circumstances, we cannot say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error."[16]  Kotteakos v. United States, 328 U.S. 750, 765 (1946).  We therefore conclude that we must vacate Defendants' convictions under § 666 because of the deficiencies in Jury Instructions 20 and 21.  See Fiore v. White, 531 U.S. 225, 228 (2001) (holding that conviction of defendant for conduct that a "criminal statute, as properly interpreted, does not prohibit . . . violate[s] due process").

---

[16] Even if a defendant has properly preserved his objection to an incorrect jury instruction, we will not set aside the verdict if we find that the error was harmless.  United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012).  However, we measure harmless error in a criminal case using two distinct standards.  The stricter standard, known as the Chapman standard, is "applicable mainly to issues of constitutional dimension, [and] requires the government to prove beyond a reasonable doubt that the error did not influence the verdict."  Id.; see Chapman v. California, 386 U.S. 18, 23-24 (1967).  The less stringent standard we cite above, called the Kotteakos standard, is "applicable mainly to trial errors that are not of constitutional dimension."  Sasso, 695 F.3d at 29.  Here it makes no difference what standard we apply because, even assuming the applicably of the less stringent Kotteakos standard, the error was not harmless.  See id.

Defendants argue that their convictions should be reversed because the indictment was barred by the statute of limitations.  The alleged unlawful conduct at issue took place through May 2005.  The indictment against Defendants was returned on June 22, 2010, more than five years after the conduct occurred.  Pursuant to 18 U.S.C. § 3282(a), "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."  However, Defendants signed tolling agreements waiving their right to allege an affirmative defense based on the statute of limitations.[17]  Defendants maintain that (1) the tolling agreements were void because they were not properly executed by the government, and (2) even if they were not void, the tolling agreements did not extend the statute of limitations period for a gratuity theory of liability on the § 666 counts.

"We review de novo a district court's decision not to dismiss on statute of limitations grounds."  United States v. Munoz-Franco, 487 F.3d 25, 52 (1st Cir. 2007); see also United

---

[17] The record does not disclose the precise reason why Defendants signed the tolling agreements.  However, "[s]uch agreements are typically entered into . . . in exchange for the government's agreement not to indict before a certain time in the hope that further discussion may result in a more favorable disposition or prevent an indictment altogether."  Robert S. Hunter, Fed. Trial Handbook: Criminal § 12:28 (2012).

<u>States</u> v. <u>Spector</u>, 55 F.3d 22, 25 (1st Cir. 1995) (applying de novo review to question of whether tolling agreement was effective waiver of defendant's rights under statute of limitations). Defendants argue that the tolling agreements never became effective because, although both Defendants and their attorneys signed them, they were never signed by the government. They rely primarily on our opinion in <u>United States</u> v. <u>Spector</u> to support this argument. In <u>Spector</u>, the government and the defendants sought to enter into a tolling agreement that would bar the application of the § 3282 limitations period. 55 F.3d at 23. That agreement provided that it would be effective "'upon execution by [the defendants] and their respective counsel and the United States by its counsel.'" <u>Id.</u> at 24. The agreement was signed by the defendants and their counsel, but not by counsel for the government. <u>Id.</u> We found that the tolling agreement was ineffective, pointing to, inter alia, the unambiguous language in the agreement. <u>Id.</u> at 25.

Defendants argue unpersuasively that we should extend <u>Spector</u> to the facts of this case. We summarized our holding in <u>Spector</u> as follows: "[w]here the parties have so deliberately set forth in writing the conditions necessary to make their agreement effective, we think it inadvisable for a court to condone deviation from one of the explicit terms, absent some good reason to do so." <u>Id.</u> We also explicitly limited our holding:

> We emphasize that we are not saying that, to
> be enforced, an agreement to extend the

> statute of limitations must be made in writing, or must be signed by the government. We say only that, <u>where the parties themselves have chosen to set forth the terms in writing</u>, it makes sense to hold them to those terms, absent good reason to do otherwise.

<u>Id.</u> at 26 n.4 (citations omitted).

Defendants' tolling agreements in the present case state: "<u>By signing this document</u>, I knowingly and voluntarily waive any rights I may have under the statute of limitations regarding charges which may result from the grand jury investigation . . . provided that such charges are brought on or before June 25, 2010." (Emphasis added.)  The agreements thus make clear that their provisions will go into effect when signed by Defendants; nothing in the agreements require counsel for the United States to sign the document as a condition of enforceability.  We therefore conclude that the failure of the government to sign the tolling agreements does not render them invalid.

As to Defendants' second argument, we need not determine whether the tolling agreements cover a gratuity theory of liability under § 666, as we have found that § 666 does not criminalize gratuities. The government may not pursue a conviction on that ground if Defendants are retried.

**V.**

Bravo challenges his conviction on count one for conspiracy to violate the Travel Act, claiming that he is entitled to a judgment of acquittal on that count.

## A. Background

Count one of the indictment charged Bravo with conspiring with Martínez and de Castro Font to commit two different crimes: (1) bribery in violation of § 666 and (2) traveling in interstate commerce in violation of 18 U.S.C. § 1952 ("the Travel Act"). A Travel Act charge must identify an unlawful purpose for the travel,[18] and the Travel Act conspiracy alleged against Bravo specified that his travel was to aid "racketeering" -- a term that covers various types of unlawful activity.[19] In this case, the only

---

[18] Section 1952, which is titled "Interstate and foreign travel or transportation in aid of racketeering enterprises," states, in pertinent part:

> (a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to--
>
> . . .
>
> (3) . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
>
> and thereafter performs or attempts to perform--
>
> (A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both . . . .

[19] A "racketeering activity" is defined in the United States Code as "any act or threat" involving certain specified crimes, including bribery, "which is chargeable under State law and punishable by imprisonment for more than one year," as well as any act indictable under numerous federal statutory provisions, including the Travel Act. See 18 U.S.C. § 1961(1); see also 18 U.S.C. § 1959(b)(1) (adopting the meaning of "racketeering activity" set forth in § 1961).

racketeering conduct that has been identified by the government is bribery in violation of federal and Puerto Rico laws.[20]  Indeed, count two, which alleged a substantive Travel Act violation, charged Bravo with traveling in interstate commerce with the intent to commit those two types of bribery, i.e., in violation of § 666 and in violation of Puerto Rico law.

On count one, the jury found Bravo guilty of conspiracy, but it rejected the § 666 (federal bribery) objective.  It found that he had conspired only to travel in interstate commerce "in aid of racketeering."  The jurors were not asked to specify the unlawful activity that was the purpose of the travel.[21]  However,

---

[20] The Travel Act object of the conspiracy described in the indictment reads as follows:

> Interstate Travel in Aid of Racketeering: that is, to travel in interstate commerce from the Commonwealth of Puerto Rico to the State of Nevada, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on, of an unlawful activity, to wit bribery in violation of the laws of the United States and the Commonwealth of Puerto Rico, in violation of Title 18, United States Code, Sections 1952(a)(3)(A) and 2.

[21] The combination of a conspiracy offense and the Travel Act produces unusual complexity because each requires an unlawful objective.  The result is that, when the two crimes are charged together, the government must show multiple layers of predicates. Hence, to prove a conspiracy to violate the Travel Act, the government must show (1) a conspiratorial agreement (2) to travel (3) in aid of a specified unlawful activity.  Here, the verdict form identified only the generic "racketeering" as the purpose of the Travel Act conspiracy, though it alleged two Travel Act objectives in the substantive count: bribery under § 666 and bribery under Puerto Rico law.  As noted, the jury found only the latter.

-57-

on count two, the substantive Travel Act offense, the jury found Bravo guilty of traveling in interstate commerce with the intent to commit bribery in violation of Puerto Rico bribery law. The jury found that he did not violate the Travel Act with the intent to commit § 666 bribery. Thus, in both the context of identifying the object of the alleged conspiracy (§ 666 bribery or Travel Act) and in the context of choosing the unlawful activity that was the target of the Travel Act (§ 666 bribery or bribery under Puerto Rico law), the jury rejected the allegation that Bravo's conduct implicated the federal bribery statute.

Bravo moved for a judgment of acquittal on count two because the Puerto Rico bribery statutes that provided the predicate for the Travel Act violation were repealed before the Las Vegas trip took place. Specifically, the laws were repealed on June 18, 2004, nearly one year before the trip; the repeal became effective on May 1, 2005, about two weeks before the trip took place. Because § 1952 requires the commission of an overt act to promote the criminal object of the travel after the interstate travel takes place, see 18 U.S.C. § 1952(a), the district court granted Bravo's motion, concluding that "the acts that defendant Bravo took to fulfill the 'thereafter' requirement all occurred after May 1, 2005, and therefore, after section 4363 was repealed. Defendant Bravo cannot be convicted of conduct that was effectively

not a crime at the time the offense took place." United States v. Bravo-Fernandez, 828 F. Supp. 2d 441, 449 (D.P.R. 2011).[22]

Bravo also moved for acquittal on the conspiracy charge, arguing that the conspiracy conviction -- which was based on a Travel Act violation -- necessarily must fall with the substantive Travel Act charge. His theory was as follows: if the only target of the Travel Act found by the jury when considering the substantive Travel Act charge (count two) was to further a violation of the Puerto Rico statutes, and that targeted activity was not unlawful, there could be no unlawful conspiracy to violate the Travel Act. In other words, he argued that the conspiracy count must be dismissed because the jury verdicts rejecting § 666 as an object of the conspiracy and as a predicate for the substantive Travel Act charge left only the repealed Puerto Rico bribery laws as the crime the jury could have found as the racketeering activity alleged to be the target of the Travel Act conspiracy. In that circumstance, there was no viable predicate for the Travel Act conspiracy.

The district court denied the motion. It held that the jury could have reached different conclusions about the objective of Bravo's travel when separately considering the conspiracy and

---

[22] Although the Commonwealth legislature enacted new bribery provisions to replace the repealed statutes, the government has not argued that the new laws provide any basis for the convictions here.

substantive Travel Act counts.  Stated otherwise, the court found that the jury's unelaborated finding on count one that Bravo had conspired to travel "in aid of racketeering" could have reflected a finding that Bravo had conspired to violate the Travel Act with the intent to promote federal program bribery.  The court considered this outcome possible even though, when considering the substantive Travel Act crime (count two), the jury found that Bravo did not violate the Travel Act for that purpose and even though the jury explicitly found (on count one) that Bravo did not conspire to violate § 666.  The court held that any inconsistency in such a scenario was not problematic.

On appeal, Bravo reiterates his argument for acquittal on the conspiracy charge.  He again asserts that it was impossible to engage in a conspiratorial agreement to travel to violate the Puerto Rico bribery statutes on May 13, 2005, two weeks after the repeal became effective and nearly a year after the legislature voted to repeal the statutes, because "one cannot conspire to commit a nonexistent crime."  In addition, he maintains that, even if the district court correctly ruled that he could be convicted for conspiring to travel in connection with a bribery that is unlawful under § 666 -- despite the jury's rejection of federal bribery as the predicate for his substantive Travel Act offense -- the conspiracy conviction cannot stand.  The problem, he asserts,

is that it is impossible to tell whether the jury based its Travel Act conspiracy finding on the federal or Commonwealth statutes.

The government, noting that a defendant may be convicted on a conspiracy charge even if he does not successfully complete the crime that is the object of the conspiracy, argues that the jury could have found that Bravo conspired to travel to violate the Puerto Rico bribery laws if an overt act was taken before the statute was repealed. The government points out that the statute was still in effect when Bravo booked the hotel reservations, ordered the boxing tickets, and took other acts "which were in furtherance of the corrupt exchange." The government interprets Bravo's argument to be a legal impossibility defense -- i.e., he could not be found guilty because it would have been impossible for him to commit the crime -- and states that "[c]ourts have come to abolish impossibility as a defense, particularly with respect to the crime of conspiracy."

Having set the scene, we now proceed to consider whether Bravo's conspiracy conviction may stand with either § 666 or Puerto Rico bribery law as the Travel Act predicate.

## B. Conspiracy to Violate the Travel Act to Promote Puerto Rico Bribery

Although the government is correct that "legal impossibility" is often an ineffective defense in a conspiracy case because a conspiracy charge does not require a completed crime, Bravo's argument implicates a more potent form of the doctrine. He

-61-

invokes what has been referred to as "pure legal impossibility," which arises when no statute "proscribe[s] the result that the defendant expected, desired, and intended to achieve." See Ira P. Robbins, Attempting the Impossible: the Emerging Consensus, 23 Harv. J. on Legis. 377, 390 (1986); see also United States v. Farner, 251 F.3d 510, 513 n.2 (5th Cir. 2001); In re Sealed Case, 223 F.3d 775, 779 (D.C. Cir. 2000). "Pure legal impossibility is always a defense. For example, a hunter cannot be convicted of attempting to shoot a deer if the law does not prohibit shooting deer in the first place." United States v. Hsu, 155 F.3d 189, 199 n.16 (3d Cir. 1998). Although Hsu's hypothetical discussed pure legal impossibility in the context of attempts, "[o]bviously a charge of conspiracy to shoot a deer would be equally untenable." In re Sealed Case, 223 F.3d at 779.

The type of legal impossibility that the government cites has been referred to as "mixed fact/law impossibility." Such cases "involve a factual mistake relating to a legal determination. In every case . . . a pre-existing law proscribed the actor's goal, thus distinguishing this category from pure legal impossibility." Robbins, supra, at 394. These cases "use[] the label 'legal impossibility' to refer to the impossibility of actually accomplishing the intended plot," although there is never "any question that if the plot had succeeded the conduct itself would be

criminal." United States v. Ali, 561 F. Supp. 2d 265, 267-68 (E.D.N.Y. 2008).

This is a case of pure legal impossibility. The jury found a conspiracy to violate the Travel Act with the intent to facilitate racketeering activity (either federal or state bribery). The evidence shows, and the indictment alleges, that the travel underlying the charge was to take place on a specific date to coincide with the boxing match between Felix Trinidad and Winky Wright scheduled for May 14, 2005 -- nearly two weeks after the repeal of the Puerto Rico bribery statutes was to go into effect. Thus, the jury could not have found Bravo guilty of conspiracy to violate the Travel Act for the purpose of aiding a violation of these Puerto Rico bribery laws because the alleged agreement was to travel at a time when Bravo's conduct could not violate those laws. That the plans to take the trip to Las Vegas were allegedly made before the statute's repeal took effect is of no significance, since the plans envisioned travel on a specific date -- after May 1. In this case, "a pre-existing statute [did] not proscribe the result that the defendant expected, desired, and intended to achieve," Robbins, supra, at 390, because the Puerto Rico bribery statutes at issue would no longer "exist" when the travel was to take place. In short, Defendants were "conspiring" to do something

that would not be prohibited by these Puerto Rico bribery laws on the date they planned to do it.[23]

An extension of the deer hunting hypothetical used in Hsu and In re Sealed Case illustrates this point. Assume that deer hunting season begins on September 1; it is against the law to hunt deer before September 1. On August 15, a man and his friend visit a sporting goods store to purchase rifles and ammunition, intending to use them to hunt deer on September 2. Are the men guilty of conspiring to illegally hunt deer? They are not: although their planning took place during a time when it would have been illegal to engage in the subject activity, no statute prohibited that activity on the date on which they planned to engage in it.

It therefore follows that, with respect to the Puerto Rico bribery basis for the alleged Travel Act violation, "since the conduct allegedly underlying the conspiracy was not a crime, no . . . conspiracy to commit that conduct can exist either." Ali, 561 F. Supp. 2d at 267.[24] The government claims, however, that even

_____

[23] We reject the government's assertion that Bravo may not benefit from the repeal without demonstrating that he had notice of it.

[24] In this case, it is not pertinent that, at the time Bravo and the others agreed to travel, the repeal of the Puerto Rico bribery statutes at issue had not yet gone into effect. The state of the law at the time of their agreement was such that, on the day they planned to travel, such travel would not be unlawful. Hence, there was no unlawful objective of their agreement, and therefore no basis for a conspiracy charge.

It might be a different case if, at the time they agreed, the legislature had not already decided to change the state of the law

if the Puerto Rico bribery predicate must be struck, the jury could have relied on § 666 as a predicate for the conspiracy to violate the Travel Act.  We now turn to that possibility.

**C. Conspiracy to Violate the Travel Act to Promote Federal Bribery**

The government urges us to adopt the view taken by the district court, i.e., that the jury's rejection of § 666 as a direct object of the conspiracy and as a predicate for the substantive Travel Act violations does not negate the possibility that the jury could have found that the conspiracy to violate the Travel Act involved planning to travel to violate § 666.  The gist of this approach is that the jury could have found that Bravo <u>conspired</u> with others to travel for the purpose of promoting federal bribery, while also finding that he neither agreed with others directly to commit federal bribery (its finding on count one) nor in fact traveled to promote federal bribery (its finding on count two).  The government admits that such a view of the jury's judgments appears inconsistent, but it asserts that the verdicts are reconcilable and therefore permissible.  It cites precedent in which inconsistent verdicts have been upheld.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Powell</u>, 469 U.S. 57, 69 (1984).

---

effective May 1, 2005.  In other words, we do not address the hypothetical situation in which Bravo and his cohorts had set their plan in motion before the legislature acted to repeal the statutes.

But the problem here is not merely the possibility of inconsistent verdicts. Rather, even if we were to assume that the jury could have relied on a § 666 theory in finding Bravo guilty on the Travel Act conspiracy count, we do not in fact know whether the racketeering activity found by the jury as a predicate was bribery under federal law or bribery under the repealed Puerto Rico statutes. We are thus confronted with a situation in which "the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." Yates v. United States, 354 U.S. 298, 312 (1957), overruled on other grounds by Burks v. United States, 437 U.S. 1 (1978). "When a jury has been presented with several bases for conviction, one of which is legally erroneous, and it is impossible to tell which ground the jury convicted upon, the conviction cannot stand." United States v. Sawyer, 85 F.3d 713, 730-31 (1st Cir. 1996); see also United States v. Mubayyid, 658 F.3d 35, 71 (1st Cir. 2011); United States v. Kavazanjian, 623 F.2d 730, 739-40 (1st Cir. 1980) (reversing verdict on multi-object conspiracy conviction under § 371 where one object failed to state a crime). We therefore conclude that Bravo's conspiracy conviction cannot be upheld.

But our inquiry does not end here. The question remains whether the judgment entered on count one as to Bravo must be reversed or whether it should be vacated and the case remanded for further proceedings. Generally, when we find that a conviction

cannot stand because the jury may have convicted upon a legally invalid basis, we will remand for a new trial, provided that there is sufficient evidence to support a conviction on a valid basis (or bases). See United States v. Pendergraft, 297 F.3d 1198, 1210 (11th Cir. 2002); Kavazanjian, 623 F.2d at 739. The government argues for that course here. It maintains that the evidence was sufficient for the jury to find that Bravo conspired to travel in interstate commerce to violate § 666 and, hence, he should be retried on count one.

We disagree. Regardless of the sufficiency of the evidence, retrial on the conspiracy count is barred by the Double Jeopardy Clause.[25] While the Double Jeopardy Clause is widely understood to bar retrial on a charge on which a defendant was previously acquitted, Yeager v. United States, 557 U.S. 110, 117-18 (2009), it also "precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial," id. at 119 (emphasis added); see also Ashe v. Swenson, 397 U.S. 436, 443-44 (1970); United States v. Orrego-Martinez, 575 F.3d 1, 6 (1st Cir. 2009). This is known as the "issue preclusion" or "collateral estoppel" prong of the Double Jeopardy Clause. United States v. Coughlin, 610 F.3d 89, 95 (D.C. Cir. 2010); United States v. Wittig, 575 F.3d 1085, 1095 (10th Cir. 2009). In determining

---

[25] Although Bravo did not formally label his challenge to the conspiracy conviction as a double jeopardy challenge, the logical conclusion of his argument is exactly that.

what was "necessarily decided" for purposes of issue preclusion, the Supreme Court has recently reaffirmed that "courts should 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" Yeager, 557 U.S. at 119-20 (quoting Ashe, 397 U.S. at 444). The Court has made clear that this "inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings,'" id. (quoting Ashe, 397 U.S. at 444), and that "the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality," Ashe, 397 U.S. at 444.

Here, the jury's verdict on count one did not expressly acquit Bravo on a Travel Act conspiracy whose purpose was to promote § 666 bribery. The verdict form for count one asked the jury to answer "yes" or "no" only as to whether Bravo had conspired to violate the Travel Act "in aid of racketeering," without specifying any racketeering activity. However, federal program bribery in violation of § 666 was one of the two racketeering crimes alleged in the indictment and argued by the government -- the other being bribery in violation of Puerto Rico law. Significantly, the jury did render a conspiracy judgment with

respect to § 666, rejecting federal bribery as a direct object of the conspiracy. The pertinent question, then, is this: by unambiguously stating on the verdict form that Bravo did not conspire to violate § 666, did the jury also "necessarily decide" that he did not conspire to travel for the purpose of violating § 666? Taking a practical, realistic approach to this question, we must answer it in the affirmative.

First, we find it difficult to fathom how the jury could have found that Bravo conspired to travel for the purpose of violating § 666 without also finding that he conspired to violate § 666. The jury's explicit rejection of the allegation that Bravo conspired to violate § 666 is strong evidence that the jury did not find federal program bribery to be the racketeering activity underlying the Travel Act conspiracy. Cf. United States v. Cabrera, 804 F. Supp. 2d 1261, 1267-70 (M.D. Fla. 2011). Second, the jury found on count two -- the substantive Travel Act count -- that Bravo was guilty only of traveling with the intent to commit bribery in violation of Puerto Rico law. Again, the jury explicitly rejected allegations that either the conspiracy or the Travel Act conduct implicated § 666.

Given these other § 666 judgments by the jury, we conclude that its verdict on the Travel Act conspiracy can only rationally be understood as a finding that Bravo conspired to travel to Las Vegas in mid-May 2005 for the purpose of promoting

Puerto Rico bribery. We will not bend over backwards to formulate some route by which the jury could have conceivably found that § 666 was the predicate of the Travel Act conspiracy when any reasonable assessment of the verdict shows that no such road was taken. We therefore conclude that re-prosecuting Bravo on count one would violate the Double Jeopardy Clause.

## VI.

Martínez also challenges his conspiracy conviction. As we shall explain, although the circumstances are different from Bravo's, the outcome is the same.

### A. Background

The jury indicated that it unanimously found Martínez guilty of conspiracy on count one. The verdict form listed three potential objects of the conspiracy, and the jury was instructed to "check all that you unanimously find to apply." The jury checked "No" as to each of the three identified objects of the conspiracy. In other words, although the jury was unanimous in finding that Martínez was guilty of conspiring to do something illegal, they were not unanimous in their view of what that illegality was.

Immediately after the verdict was read by the courtroom deputy, Martínez's attorney, Mr. Lowell, asked the court to strike the verdict on count one, stating: "As to Hector Martínez, they found 'no' for all the particulars, so, consequently, this is an impossibility." The court and the government were uncertain about

the proper course. Lowell, however, remained steadfast, asserting that "as to Count 1, by law, you have to enter the verdict of not guilty as to Count 1 as to Mr. Martínez."

Lowell then asked the court to poll the jury individually as to count five, the substantive federal bribery count. The government recommended that the court simply take a general poll. Bravo's attorney, Mr. Chesnoff, asked that the jury be polled individually "as to every count and every specification," stating that "[y]ou have a jury that has obviously been confused about its verdict." The court rejected both defense attorneys' requests and conducted only a general poll, asking each juror if the verdict announced by the courtroom deputy was his or her verdict. This approach did not clarify the issue with the conspiracy verdict as to Martínez.

After the jury was polled, the court asked if there were any motions by the defense. Attorney Lowell reiterated his contention that "the Court must vacate Count 1." The court responded: "All right. Well, let me discharge the jury, and well -- we'll deal with those legal matters later." The jury was escorted from the courtroom, and Lowell again stated that the jury's verdict on Martínez's conspiracy charge was "a legal impossibility," and "that being the case, the Court must strike that guilty verdict. There's no alternative." The government pushed back, asking the court for time to brief the issue before it

made its decision. After some further back and forth, the court stated: "I agree with Mr. Lowell. Count 1 as far as Defendant Martínez is dismissed." The discussion then shifted to other matters.

In a short order issued the next day, the court sua sponte "reinstated" Martínez's conviction on count one "without prejudice of the parties having a full opportunity to brief the issues discussed in open court." Martínez filed an eighteen-page brief three days later, stating that the court's change of course was "beyond surprising" and insisting that the further proceedings ordered by the court "are an affront to the Fifth Amendment's Due Process and Double Jeopardy Clauses, and the Sixth Amendment's right to trial by jury." He argued that "[a]lthough the statutory basis for Mr. Lowell's motion and this Court's decision was not cited, it was plainly a motion made and a judgment rendered under [Federal] Rule [of Criminal Procedure] 29," and that double jeopardy therefore attached. The government filed a "non-opposition" to Martínez's motion shortly thereafter, indicating that "the Court should dismiss defendant Martínez's guilty verdict on Count One." The next day, however, the government filed a supplemental response, arguing that, at most, Martínez would be entitled to a mistrial pursuant to Federal Rule of Criminal Procedure 33 on count one and a dismissal without prejudice, not a Rule 29 dismissal based on insufficiency of the

evidence.  Martínez replied that the dismissal sought and granted was a dismissal pursuant to Rule 29, that the dismissal was properly granted, and that the court's decision could not be withdrawn or relitigated, as jeopardy attached to it.

On August 30, 2011, the district court issued an order stating that the initial dismissal did not preclude a mistrial. The court stated that because it did not explicitly make a finding that the evidence was insufficient to sustain the conviction, Rule 29 was not implicated.  Instead, it maintained that "the Court 'dismissed' [the] verdict based on defense counsel's claim of 'legal impossibility.'"  Moreover, the court stated that even if its actions fell within the scope of Rule 29, the Double Jeopardy Clause permits a prosecution appeal to reinstate a jury's guilty verdict that a judge subsequently discarded.

## B. Legal Principles

The Fifth Amendment states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  The Double Jeopardy Clause "shields a defendant from a second prosecution for the same offense after either conviction or acquittal."  United States v. Morris, 99 F.3d 476, 478 (1st Cir. 1996).  In determining whether the Double Jeopardy Clause has been violated, "a reviewing court first must ask whether jeopardy attached in the original [trial] court proceeding."  United States v. Pacheco, 434 F.3d 106, 112 (1st Cir.

2006) (alteration in original) (citation omitted) (internal quotation marks omitted).

"Perhaps the most fundamental rule in the history of double jeopardy jurisprudence has been that '[a] verdict of acquittal . . . could not be reviewed, on error or otherwise, without putting [a defendant] twice in jeopardy, and thereby violating the Constitution.'" United States v. Martin Linen Supply Co., 430 U.S. 564, 571 (1977) (alteration in original) (quoting United States v. Ball, 163 U.S. 662, 671 (1896)). We have previously held that "[i]t is beyond cavil that, for double jeopardy purposes, the finality accorded to jury verdicts of acquittal extends equally to judicially rendered judgments of acquittal." Pacheco, 434 F.3d at 112. It is therefore critical to determine whether the district court's statement that "Count 1 as far as Defendant Martínez is dismissed" constitutes a judgment of acquittal.

The Supreme Court has repeatedly "emphasized that what constitutes an 'acquittal' is not to be controlled by the form of the judge's action." Martin Linen, 430 U.S. at 571; see also United States v. Scott, 437 U.S. 82, 96 (1978); United States v. Sisson, 399 U.S. 267, 290 (1970). Instead, a reviewing court "must determine whether the ruling of the judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." Martin Linen, 430

-74-

U.S. at 571; see also Pacheco, 434 F.3d at 112. That the district court did not explicitly invoke Rule 29 in "dismissing" count one, then, is not dispositive on the issue of whether its actions constituted an acquittal. Cf. United States v. Jorn, 400 U.S. 470, 478 n.7 (1971) ("[T]he trial judge's characterization of his own action cannot control the classification of the action for the purposes of our appellate jurisdiction.").

The difficulty in this case is that the district court's assessment of the conspiracy charge as to Martínez does not directly engage with the facts presented at trial. Instead of the normal inquiry into factual sufficiency, the court's determination that the conspiracy count must be "dismissed" appears to be based on a legal conclusion regarding the requirements of a conspiracy conviction under 18 U.S.C. § 371 -- specifically, that if the jury cannot reach an agreement as to the object of a conspiracy, the conviction cannot stand as a matter of law. The Supreme Court, however, has not limited acquittals for double jeopardy purposes to cases involving factual assessments of the evidence presented to the jury. In several cases, including one decided earlier this year, the Supreme Court has held that legal determinations by the court can create a double jeopardy bar to retrial.

In Arizona v. Rumsey, an Arizona trial judge conducted a sentencing hearing to determine whether a defendant convicted of armed robbery and first degree murder was eligible for the death

penalty.  467 U.S. 203, 205 (1984).  The trial judge mistakenly held that Arizona's statutory aggravating factor covering killings for pecuniary gain was limited to "a contract-type killing situation and not robbery, burglary, etc."  Id. at 206 (quotation marks omitted).  The judge therefore found no aggravating circumstances and sentenced the defendant to life imprisonment. Id.  The State successfully appealed to the Supreme Court of Arizona and obtained a death sentence on remand under the proper standard.  Id. at 207-08.  The U.S. Supreme Court found that the retrial on the penalty phase issue was a double jeopardy violation, because the trial judge's original "judgment, based on findings sufficient to establish legal entitlement to the life sentence, amounts to an acquittal on the merits and, as such, bars any retrial of the appropriateness of the death penalty."  Id. at 211. It continued:

> In making its findings, the trial court relied on a misconstruction of the statute defining the pecuniary gain aggravating circumstance. Reliance on an error of law, however, does not change the double jeopardy effects of a judgment that amounts to an acquittal on the merits.  "[T]he fact that the acquittal may result from erroneous evidentiary rulings or erroneous interpretations of governing legal principles . . . affects the accuracy of that determination, but it does not alter its essential character."

Id. (quoting United States v. Scott, 437 U.S. 82, 98 (1978)) (emphasis added) (internal quotation marks omitted).

Just two years after Rumsey, the Court considered another case in which a judge's "legal determination" was at issue. In Smalis v. Pennsylvania, the Supreme Court of Pennsylvania held that a demurrer, which requires the court to determine "whether the evidence, if credited by the jury, is legally sufficient to warrant the conclusion that the defendant is guilty beyond a reasonable doubt," does not involve a factual determination, but rather "purely one of law," and is therefore not the equivalent of an acquittal for double jeopardy purposes. 476 U.S. 140, 143 (1986) (internal quotation marks omitted). The U.S. Supreme Court reversed in a brief opinion, stating that "[w]hat the demurring defendant seeks is a ruling that as a matter of law the State's evidence is insufficient to establish his factual guilt," which constitutes an acquittal under the Double Jeopardy Clause. Id. at 144.

The Court recently reaffirmed its positions in Rumsey and Smalis in Evans v. Michigan, 133 S. Ct. 1069 (2013). In Evans, the Supreme Court considered "whether retrial is barred when a trial court grants an acquittal because the prosecution had failed to prove an 'element' of the offense that, in actuality, it did not have to prove." Id. at 1074. The Court found that, in substance, the issue was no different than the one presented in Rumsey: it "involve[d] an antecedent legal error that led to an acquittal because the State failed to prove some fact it was not actually

required to prove." Id. at 1076. The fact that Evans involved the addition of a nonessential element, while Rumsey involved only the misinterpretation of an essential element, was of no moment to the Court. Id. at 1076-77. The Court held that the trial court's "judgment, however erroneous it was, precludes reprosecution." Id. at 1078 (internal quotation marks omitted).

## C. Application

With these decisions in mind, we have little difficulty concluding that the district court's "dismissal" of the conspiracy count against Martínez was an acquittal. Rightly or wrongly,[26] the court agreed with Lowell's assertions that a conspiracy with no object was "a legal impossibility," and that the jury's verdict must be "struck" and the count "dismissed." In so finding, the court made a determination as to the legal requirements necessary for a conspiracy conviction under § 371 and concluded that the jury had found the evidence insufficient to meet those requirements.[27]

---

[26] Because the correctness of the district court's decision on this issue is irrelevant, we choose not to address it, other than to note that there appears to be no case law directly on point. Martínez relies primarily upon an out-of-circuit district court case involving facts that differ materially from the present case, United States v. Lucarelli, 490 F. Supp. 2d 295 (D. Conn. 2007), while the government cites to an Eighth Circuit case that involved a special verdict form in a bankruptcy fraud case, United States v. Mitchell, 476 F.3d 539 (8th Cir. 2007). Neither offers clear guidance.

[27] Although double jeopardy cases in which courts order an acquittal based on the sufficiency of the evidence ordinarily involve the court's assessment of the evidence itself, the principles are equally applicable in this somewhat different

For our purposes, it does not matter if this interpretation of § 371 added "an 'element' of the offense that, in actuality, [the government] did not have to prove," id. at 1074; misconstrued the actual elements of the statute, Rumsey, 467 U.S. at 211; or faithfully adhered to the statute's requirements.  All that matters is that the district court made "a determination that the [government] had failed to prove its case."  Evans, 133 S. Ct. at 1075.

One issue remains for our consideration.  In declaring a mistrial, the district court found that even if the initial "dismissal" could be considered a judgment of acquittal, the Double Jeopardy Clause would not prevent an appeal by the government to reinstate the jury's original guilty verdict.  In support of this proposition, the court cited Smith v. Massachusetts, which states:

> Our cases have made a single exception to the principle that acquittal by judge precludes reexamination of guilt no less than acquittal by jury: When a jury returns a verdict of guilty and a trial judge (or an appellate court) sets aside that verdict and enters a judgment of acquittal, the Double Jeopardy Clause does not preclude a prosecution appeal to reinstate the jury verdict of guilty.

---

context.  Here, the court determined that the jury had functionally acquitted Martínez on the conspiracy count.  See Evans, 133 S. Ct. at 1075 ("[A]n 'acquittal' includes a ruling by the court that the evidence is insufficient to convict, a factual finding [that] necessarily establish[es] the criminal defendant's lack of criminal culpability, and any other rulin[g] which relate[s] to the ultimate question of guilt or innocence." (alterations in original) (emphasis added) (citations omitted) (internal quotation marks omitted)).

543 U.S. 462, 467 (2005).  Although at first blush this principle, first announced in United States v. Wilson, 420 U.S. 332, 352-53 (1975), seems potentially applicable to the present case, it is not.

As the Court noted in Rumsey, "[n]o double jeopardy problem was presented in Wilson because the appellate court, upon reviewing asserted legal errors of the trial judge, could simply order the jury's guilty verdict reinstated; no new factfinding would be necessary, and the defendant therefore would not be twice placed in jeopardy."  467 U.S. at 211-12.  The Rumsey Court found that the Wilson exception was inapplicable to that case, because "[w]hereas the defendant in Wilson was not to be subjected to a second trial after an acquittal at his first, that is precisely what . . . happened" to Rumsey.  The Court has made clear that the Wilson exception does not violate the Double Jeopardy Clause precisely because allowing appeal in those circumstances does not subject a defendant "to further factfinding proceedings going to guilt or innocence" following an acquittal.  Smith, 543 U.S. at 467 (internal quotation marks omitted); see also Smalis, 476 U.S. at 145 ("[S]ubjecting the defendant to postacquittal factfinding proceedings going to guilt or innocence violates the Double Jeopardy Clause.").

Here, the government presumably requested a dismissal without prejudice of Martínez's conviction so that it can

reprosecute him under § 371. If we were to allow the district court to recast its acquittal as a mistrial, the government would get another opportunity to subject Martínez to "factfinding proceedings going to guilt or innocence," hoping this time for a less ambiguous result. That would be a classic instance of impermissible double jeopardy. Because the court's "dismissal" was an acquittal for double jeopardy purposes, and because the <u>Wilson</u> exception does not apply, the decision cannot be reconsidered. <u>See</u> <u>Smith</u>, 543 U.S. at 470-73.

## VII.

For the foregoing reasons, we <u>reverse</u> Bravo's conspiracy conviction, and <u>reverse</u> the district court's order declaring a mistrial as to Martínez's conspiracy count. We direct the district court to enter a judgment of acquittal on both charges. We <u>vacate</u> Martínez's and Bravo's § 666 convictions and <u>remand</u> for further proceedings consistent with this opinion.

**– Concurring Opinion Follows –**

**HOWARD, <u>Circuit Judge</u>, concurring in part and concurring in the judgment.** I join the court's judgment, although on one issue I would reach the same result by a different route. The majority concludes, as a matter of law, that Section 666 does not criminalize gratuities. I believe that the statute is unclear enough that the rule of lenity precludes the defendants' convictions to the extent that they could have rested on a gratuity. While the majority does an admirable job of explaining its reasoning, other considerations give me pause.

First, the Supreme Court has stated that "[a]n illegal gratuity . . . may constitute merely a <u>reward</u> for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." <u>United States</u> v. <u>Sun-Diamond Growers of Cal.</u>, 526 U.S. 398, 405 (1999) (emphasis added). Thus, a "reward" can be a payment that does not influence an official's actions, a reading that the majority rejects when interpreting Section 666. Although the Court was not interpreting Section 666 or defining the word "reward," it was interpreting Section 201, a closely related statute. Thus, I hesitate to conclude that the meaning of "reward" as used in Section 666 is at odds with the Court's use of that word.

Second, a problem arises if we read the bribery provision of Section 201(b) to prohibit the same conduct as Section 666. Section 201(b) prohibits giving or receiving anything of value with

the intent to "influence" or of "being influenced."  18 U.S.C. § 201(b)(1)(A), (b)(2)(A).  Section 666, by contrast, prohibits giving or receiving anything of value with the intent to "influence or reward" or "to be influenced or rewarded."  Id. § 666(a)(2), (a)(1)(B).  If the scope of these prohibitions is the same, then the word "reward" has no independent meaning in Section 666, which would seem to violate the requirement that we are to give effect to every word of a statute.  See Ransom v. FIA Card Servs., N.A., 131 S. Ct. 716, 724 (2011).  I am not sure that this problem can be resolved by reading "reward" as clarifying how a bribe can be timed, as the majority does.

Third, Appendix A to the United States Sentencing Guidelines Manual provides that Section 2C1.2, the guideline covering gratuities, applies to both Section 666(a)(1)(B) and Section 666(a)(2).  Although the Sentencing Commission cannot change the meaning of a statute, Congress does have the opportunity to review proposed guidelines before they become effective. 28 U.S.C. § 994(p).[28]  Moreover, we have held that "Chevron deference is the proper criterion for determining whether a guideline (or, for that matter, commentary that suggests how a

---

[28] Like the majority, I am concerned with the disparity between the statutory maximum sentences for an illegal gratuity under Section 201 and for a violation of Section 666.  But I would point out that an illegal gratuity carries a base offense level three levels lower than bribery does, U.S. Sentencing Guidelines Manual §§ 2C1.1(a), 2C1.2(a) (2012).

guideline should be read) contravenes a statute." <u>United States</u> v. <u>LaBonte</u>, 70 F.3d 1396, 1404 (1st Cir. 1995), <u>rev'd on other grounds</u>, 520 U.S. 751 (1997).[29]  While I do not suggest that <u>LaBonte</u>'s rule applies here, the Sentencing Commission's determination that the gratuity guideline applies to Section 666 does at least give me pause as to Congress's meaning.

In the end, I would apply the rule of lenity because it is ambiguous whether Section 666 criminalizes gratuities.  "The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."  <u>United States</u> v. <u>Santos</u>, 553 U.S. 507, 514 (2008) (plurality opinion).  We apply the rule of lenity "only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended."  <u>Reno</u> v. <u>Koray</u>, 515 U.S. 50, 65 (1995) (citations omitted) (internal quotation marks omitted).  Here, I can make no more than a guess as to what Congress intended Section 666 to mean.  Therefore, I would hold that the defendants cannot be convicted for giving or receiving a gratuity.

---

[29] When the Supreme Court decided <u>United States</u> v. <u>LaBonte</u>, the three dissenting justices stated that <u>Chevron</u> deference was appropriate, 520 U.S. at 777 (Breyer, J., dissenting), while the remaining justices chose not to decide the issue, <u>id.</u> at 762 n.6.